371 F.2d 486
 Harvey PICKER and Jean Picker
v.
The UNITED STATES.
Harvey PICKER and Evelyn Picker, as the Executors of the Estate of James Picker, and Evelyn Picker
v.
The UNITED STATES.
 Nos. 370-63.
 Nos. 371-63.
 United States Court of Claims.
 January 20, 1967.
 
 Mason G. Kassel, New York City, attorney of record, for plaintiffs.
 Saylor L. Levitz, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant; Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.
 OPINION
 PER CURIAM:
 
 
 1
 This case was referred to the late Trial Commissioner Robert K. McConnaughey, with directions to make findings of fact and recommendation for conclusions of law. The commissioner did so in an opinion and report filed on January 26, 1966. Exceptions to the commissioner's report were filed by the defendant. The parties have filed briefs and the case has been orally argued. Since the court is in agreement with the opinion, findings and recommendation of the trial commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiffs are, therefore entitled to recover and judgments are entered for plaintiffs with the amounts of recovery to be determined pursuant to Rule 47(c).
 
 
 2
 Commissioner McConnaughey's opinion,* as modified by the court, is as follows:
 
 
 3
 The plaintiffs in these cases seek to recover, with interest, refunds of amounts paid by Harvey Picker, one of the plaintiffs, and his father, James Picker (who died June 28, 1963),[1] as income taxes for 1958, and as interest thereon.
 
 
 4
 The Pickers' claims derive from allegedly improper disallowance of their deduction, in computing their 1958 taxes, of two payments of $50,000 each, which they made in 1958 to F. Eberstadt & Co., an investment banking firm in New York City, for investment and financial services rendered by Eberstadt & Co. between 1951 and 1958.
 
 
 5
 The basic issue is whether, within the meaning of section 212 of the Internal Revenue Code of 1954,[2] the payments made by the Pickers to Eberstadt & Co. were deductible as ordinary and necessary expense incurred by the Pickers as individuals for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.
 
 
 6
 That issue turns upon a decision whether the services for which the Pickers made the payments were performed for the Pickers individually, or for a group of corporations (hereafter called the Picker group), most of the stock of which the Pickers owned, and whether, if the services paid for were performed for the Pickers individually, the payments properly should be regarded as ordinary and necessary expenses of the Pickers or as capital expenditures incurred by them.
 
 
 7
 The answers to these questions depend primarily on the facts, which differ substantially from those of any of the cases upon which the parties rely. The facts are rather fully summarized because significant implications from details of the transactions afford the basis for gauging the extent to which principles announced in previous cases may or may not apply.
 
 
 8
 The events that gave rise to the controversy occurred over a period of approximately 7 years — from 1951 to 1958 — during which Eberstadt & Co. performed services, hereafter described, in response to a succession of requests made by the Pickers.
 
 
 9
 The genesis of Eberstadt & Co.'s employment was the Pickers' dissatisfaction, in the early 1950's, with the pattern of their investments, which then were largely concentrated in stocks of the corporations composing the Picker group.
 
 
 10
 At that time the Pickers were the dominant personalities in the Picker group. They were the chief executive officers, and members of the board of directors of each of the Picker corporations. They owned all of the stock of the two principal Picker corporations. Such stock in the Picker group as they did not own was stock in subsidiary or affiliated corporations that had been bought by corporate officials to whom it had been offered for incentive purposes.
 
 
 11
 The Pickers each drew salaries of over $100,000 a year as compensation for their services as officials of the Picker corporations. Their salaries, supplemented by relatively small amounts from outside investments, provided most of their income. Their investment in stock of corporations in the Picker group was by far their most substantial investment.
 
 
 12
 The Picker stocks were not listed on any securities exchange. Nor does it appear that they had any market over-the-counter, or that they provided the Pickers with any substantial income in the form of dividends.
 
 
 13
 The corporations composing the Picker group were variously engaged in the manufacture, sale, and servicing of X-ray equipment, and related activities.
 
 
 14
 The two principal corporations in the group, each of which was wholly owned by the Pickers, were Picker X-Ray Corporation (hereafter called Picker X-Ray), a New York corporation with offices in White Plains, New York, and Picker X-Ray Corporation-Waite Manufacturing Division, Inc. (hereafter called Picker-Waite), an Ohio corporation that manufactured X-ray equipment at Cleveland, Ohio. Picker X-Ray sold and serviced, in the eastern United States, the X-ray equipment manufactured by Picker-Waite.
 
 
 15
 The other corporations composing the Picker group, some of which were partially owned by their officers through minority stock interests, were subsidiary or affiliated companies, engaged primarily in the manufacture, sale, and servicing of X-ray equipment in other parts of the United States and in foreign countries.
 
 
 16
 The Picker group had grown out of a pharmacy business formed by James Picker in the early 1900's, which progressed into the distribution of X-ray supplies (through Picker X-Ray, incorporated in 1922), and, beginning in the 1930's, into the manufacture of X-ray equipment. As the business grew, subsidiaries and affiliated corporations were formed to serve various particularized functions. By the 1950's, the Picker group had become the largest manufacturer and distributor of X-ray equipment in the United States and one of the largest in the world.
 
 
 17
 The Pickers were proud of the reputation and public standing of the Picker enterprise and its products. There is no evidence that they were ever discontented with its financial condition, or that improvement of its fiscal welfare was ever a primary or an independent objective of any of their dealings with Eberstadt & Co. Their principal concern centered, throughout, on adaptation of their personal investments to what they considered to be the welfare of their personal estates and their personal requirements for income. They consistently sought assurance, however, that these objectives would be achieved without detriment to the commercial and professional reputation of the Picker name or to the prospect that Picker products would continue to command high public regard.
 
 
 18
 Sometime before April of 1951 the Pickers became convinced that it was unwise for them to continue to have the preponderant bulk of their estates invested in securities of the Picker group, which produced little, if any, income from dividends and, because they were not actively traded in the securities markets, were not readily marketable. For these reasons they decided to seek ways to achieve greater diversification, marketability, and income than their investments in the Picker group provided.
 
 
 19
 The Central Hanover Bank had been advising them on their investments, but the official of the bank with whom they had been dealing suggested that an investment banker would be better equipped than a commercial bank to advise them on the kinds of problems involved in a program of the sort they had in mind. Accordingly, in the spring of 1951, he introduced the Pickers to Ferdinand Eberstadt, the senior partner of Eberstadt & Co.
 
 
 20
 The Pickers' dealings with Eberstadt & Co. extended by fits and starts over a period of about 7 years but failed to produce the completed transactions whereby the Pickers' investments in the Picker group were finally diversified into other securities.
 
 
 21
 The Pickers' first meeting with Eberstadt was in April of 1951. They explained their concern about the concentration of their investments in the Picker group and inquired about means of achieving greater diversity, greater liquidity, and more investment income.
 
 
 22
 At the same time they made evident their personal pride in the Picker enterprise and their desire to accomplish their personal investment objectives in a manner that would not be detrimental to it.
 
 
 23
 Eberstadt told the Pickers there were various ways to achieve what they wanted, and that he believed Eberstadt & Co. could be helpful to them, and he undertook to give the matter further thought. Although there may have been some general discussion of alternative means of proceeding, apparently Eberstadt made no very specific suggestions at the first meeting. Eberstadt & Co.'s compensation for whatever services it might perform was not mentioned.
 
 
 24
 The Pickers met with Eberstadt again many times between April of 1951 and May of 1958. Early in the course of these discussions, Eberstadt suggested several ways the Pickers might diversify the base of their investments so as to acquire greater liquidity and greater investment income. He did not consider their problem unusual and regarded the kinds of remedies he suggested as conventional ways of achieving the objectives they had outlined to him.
 
 
 25
 He made, and explained to them, in general terms, three principal suggestions for accomplishing what they wanted to do.
 
 
 26
 One was a public sale of some or all of their holdings in the Picker enterprise and investment of the proceeds in selected, diversified securities.
 
 
 27
 The second was a private sale of their Picker stock, for cash, to a single purchaser, such as a large corporation, followed by reinvestment of the proceeds in securities that would afford them the desired diversification, liquidity, and income.
 
 
 28
 The third was an exchange of their Picker securities for stock of some large, listed corporation that would provide the investment qualities they sought, or, if it did not, could be sold readily and replaced by other securities that did fulfill their objectives.
 
 
 29
 At a meeting late in January of 1952, the third alternative, the possibility of merging the Picker enterprise with some listed company through an exchange of stock, was discussed generally, and Eberstadt suggested several companies as specific merger prospects that might meet the Pickers' requirements.
 
 
 30
 At that meeting Eberstadt told the Pickers that Eberstadt & Co.'s fee would be between 2½ and 3 percent, in case a merger should be accomplished through its efforts. He said they could terminate Eberstadt & Co.'s work at any time without being committed for compensation, but that they might wish to reimburse Eberstadt & Co. for expenses, depending on the amount of work done.
 
 
 31
 The meeting in January 1952, and another general discussion, held in September 1952, both ended inconclusively. In each case, the Pickers were to get in touch with Eberstadt after thinking the matter over.
 
 
 32
 Nothing more happened until July 7, 1954, when the Pickers again discussed with Eberstadt, in general terms, the possibility of a merger with some outstanding, listed company. Eberstadt again suggested a number of companies as possibly suitable candidates for a merger. It was apparent to Eberstadt, however, that the Pickers had not yet made up their minds what course to pursue, and he emphasized the need for them to decide between a merger, a public offering, or continuing the situation that then prevailed.
 
 
 33
 At the meeting on July 7, 1954, Eberstadt told the Pickers that Eberstadt & Co. was prepared to assist in making a public offering of their Picker stock for approximately 8 percent of the amount realized, or, if a merger should be effected through the efforts of Eberstadt & Co., the commission would not be higher than 3 percent. He also said that, as a prelude to either a merger or public offering, it might be necessary to consolidate some of the corporations in the Picker group.
 
 
 34
 The Pickers again made clear their belief that the Picker enterprise was what they called a "Tiffany" organization and should be merged only with a company of top rank, and, again, at the conclusion of the July 7, 1954 meeting, the Pickers said they would be in touch with Eberstadt when they had come to a decision.
 
 
 35
 It was apparent to Eberstadt, from a summary financial statement the Pickers had at the meeting on July 7, 1954, that information concerning the Picker enterprise had never been assembled in the form necessary for effectuating either a public offering of the Pickers' stock or a merger of the Picker group with some other corporation.
 
 
 36
 A few days later, on July 12, 1954, Eberstadt wrote Harvey Picker suggesting that Eberstadt & Co. might prepare a confidential report on the Picker enterprise that would include a comprehensive analysis of the business and confidential recommendations concerning the relative advantages to the Pickers, as owners of the enterprise, of various courses they might pursue.[3]
 
 
 37
 About a month later Eberstadt submitted to Harvey Picker a specific proposal that Eberstadt & Co. "undertake a study of your business", report its conclusions concerning the value of the business "whether by private or public sale or issuance of securities", and make recommendations "as to the best course for the present owners to pursue, considering * * * not simply business and financial elements, but also the need and desires of the principals."
 
 
 38
 Eberstadt's letter proposed to charge $7,500 for the study and reports, plus expenses, and proffered the services of Eberstadt & Co. to aid in consummating whatever program the Pickers might finally adopt. He restated, essentially unchanged, his earlier proposals as to the rates of Eberstadt & Co.'s compensation for handling either a merger or a public or private sale of the Picker securities, and suggested that the amount paid for the reports might be credited against Eberstadt & Co.'s compensation for perfecting either a public offering or private placement of securities "for the account of the company or its principal stockholders," or "the negotiation of a merger."
 
 
 39
 On August 17, 1954, the Pickers agreed to Eberstadt's proposal, including the proposed range of Eberstadt's & Co.'s compensation in case of a merger, and arrangements were made for preparation of the report.
 
 
 40
 The Pickers asked that if, in preparing the report, Eberstadt & Co.'s representatives should find it necessary to tell officers of the Picker group what they were doing, they should say that they were working on a report in conjunction with the giving of financial advice to the Picker family with regard to possible public distribution of some of their stock holdings.
 
 
 41
 This request was consistent with a policy the Pickers followed throughout their dealings with Eberstadt, of proceeding as individuals, without giving others in the Picker organization any more information than necessary about what they were doing, and without procuring any formal grants of corporate authority for their negotiations. Participation by other Picker officials in the work connected with the development and consideration of various proposals was limited to that needed to furnish essential information.[4]
 
 
 42
 The report was completed in November of 1954. Two employees of Picker X-Ray (Zysman and Barney) assisted in its preparation.
 
 
 43
 It was submitted in two parts, with covering letters addressed to the Pickers as chairman and president, respectively, of Picker X-Ray. It was marked "Confidential," with an admonition, on its cover, that its "use or dissemination without prior approval of Messrs. James Picker or Harvey Picker is not authorized."
 
 
 44
 The total cost of the report was billed to, and paid for, by Picker X-Ray. Harvey Picker explained that the intimate knowledge he and his father had of the details of the business had precluded any need, in connection with the routine management of the enterprise, for a comprehensive report of the kind Eberstadt & Co. prepared, but that, in dealing with other large firms, he had sometimes found it awkward to try to describe the Picker enterprise, and that he regarded the report as providing an organized statement about the Picker group that would be useful to him as a corporate officer. As a consequence he considered the report as an asset the company ought to have, and he and his father decided that Picker X-Ray should pay for it.
 
 
 45
 On one or two occasions, later, Harvey Picker discussed with Eberstadt the possibility that the cost of the report might be offset against Eberstadt & Co.'s charges for perfecting arrangements then currently under consideration, but none of the arrangements was consummated, and the $100,000 the Pickers ultimately paid Eberstadt & Co. was not subject to any specific offset of the $7,500 paid by the corporation for the report.
 
 
 46
 In December 1954, a month or so after the report was submitted, a decision was made to embark upon a "dual program," simultaneously exploring the possibilities of a merger with Sylvania Electric and preparing for a public offering.
 
 
 47
 At a meeting on December 29, 1954, representatives of a public accounting firm were asked to prepare financial statements in a form that would be useful in connection with either a public offering or a merger. Arrangements for simplifying the structure of the Picker enterprise, preparatory to a merger or public sale of the Pickers' stock, were also discussed, and Eberstadt asked that, in addition to the contingent compensation he had previously proposed, Eberstadt & Co. be paid a fee of $5,000 a month, plus expenses, until the Pickers elected to go ahead on one course or the other. Unlike the fee for the report, the proposed $5,000 monthly retainer was not to be subject to credit against Eberstadt & Co.'s compensation for a consummated transaction. The Pickers did not accept the proposal for a $5,000 monthly retainer.
 
 
 48
 Nevertheless, between the end of 1954 and April of 1956, Eberstadt & Co. initiated a succession of contacts with large, established corporations, in an effort to elicit interest in a merger with the Picker group, and worked up general outlines of several proposals for specific transactions, none of which materialized.[5]
 
 
 49
 On April 4, 1956, conversations were initiated with Textron Inc. On August 22, 1956, after an exchange of unacceptable proposals, Textron offered $13 million for 100 percent of the stock of all the Picker corporations, or somewhat less if minority interests should not participate. The offer involved $8 million in cash and $5 million in Textron notes. The Pickers made a counter-proposal, calling for $10 million in cash and $3 million in notes, the terms of the notes to be satisfactory to the Pickers.
 
 
 50
 On September 13, 1956, Eberstadt & Co. received a proposal from Textron which appeared to meet the terms of the Pickers' counter-proposal of August 22, and the investment objectives the Pickers had expressed to Eberstadt throughout their dealings, but Harvey Picker rejected the proposal. He had not discussed it with anyone in the Picker group except his father and Zysman, the auditor. In a letter to Textron, he said:
 
 
 51
 After careful investigation and deliberation, Dad and I feel that it probably is not to the best interest of Textron and Picker X-Ray for the two organizations to join forces at present.
 
 
 52
 Apparently this was a euphemistic way of saying that the Pickers had decided they did not want the proposed $3 million of Textron notes which, according to the proposal, were to be subordinated to Textron's bank debt.
 
 
 53
 In the course of Harvey Picker's telephone conversation with Eberstadt & Co.'s representative, when he first indicated the Pickers were going to reject the Textron proposal, he said they felt that they should now try to acquire another company to use up excess cash of the Picker group and improve earnings. Shortly thereafter, in October of 1956, he specifically asked Eberstadt & Co. to make a brief examination of Tracerlab, Inc., and to recommend means whereby Picker X-Ray might acquire Tracerlab. Eberstadt & Co. prepared a six-page memorandum on the subject, part of which was sent to Picker, but no action was ever taken toward acquiring Tracerlab.
 
 
 54
 Thereafter negotiations lapsed until June of 1957 when Harvey Picker called Eberstadt & Co. and again asked them to find merger candidates. Arrangements were made then to bring the 1954 report up to date and Eberstadt requested a $7,500 retainer fee and proposed, in case a merger should be accomplished, a contingent fee, equal to 3 percent of the value of any shares received by the Picker stockholders. The $7,500 retainer was to be offset against the 3-percent fee if a merger should be consummated. Eberstadt explained the 3-percent rate (which was at the top of the range previously discussed), by saying that it took into account the considerable amount of work Eberstadt & Co. had done for the Pickers, including the development of the Textron offer, on ostensibly acceptable terms, which the Pickers had rejected. The Pickers never accepted the proposal for a $7,500 retainer.
 
 
 55
 During the summer and fall of 1957, various additional companies were sounded out but found to be not interested. A public offering of approximately a third of the Pickers' holdings of a proposed new Picker common stock was also considered, but no definite action was taken.
 
 
 56
 In February of 1958 discussions of a deal with Bell & Howell commenced and meetings and correspondence ensued that led to the development of a proposal for a merger on terms that would afford the Pickers positions in the merged company and would continue the Picker trade name on the products of a proposed Picker division or subsidiary of the combined enterprise.
 
 
 57
 A specific proposal by Bell & Howell was submitted to the Pickers on May 2, 1958, together with an analysis by Eberstadt & Co. of the earning power of the combined companies and of the securities to be received by the Picker stockholders. What was proposed was a statutory merger in which the Pickers and other stockholders of Picker X-Ray, Picker-Waite, and the subsidiary corporations, would receive preferred and common stock in the merged company, and stockholders of the affiliated corporations would receive cash. The total value of the shares and cash to be paid for the Picker holdings was in the neighborhood of $20 million.
 
 
 58
 The Bell & Howell proposal conformed with the investment objectives the Pickers had expressed to Eberstadt.
 
 
 59
 On May 5, 1958, Harvey Picker authorized delivery of a letter to representatives of Bell & Howell saying that the Pickers were prepared to enter into a transaction along the lines proposed, if tax problems could be worked out, but, on May 13, 1958, he wrote to Eberstadt saying, "[W]e have decided not to go ahead with the proposed merger of Picker X-Ray and Bell & Howell."
 
 
 60
 The letter included, also, the following statement:
 
 
 61
 In spite of the fact that our agreement was that you would be paid upon the consumation [sic] of a merger or sale, my father and I feel it would be fair at this time to provide some compensation to your organization for its efforts on our behalf. This is probably an appropriate time also to express our appreciation for the work you and your colleagues have done.
 
 
 62
 The Pickers' preference for an all-common-stock deal instead of the preferred and common stock and cash offered by Bell & Howell may have contributed to their rejection of the Bell & Howell proposal but their decision was influenced primarily by developments in direct negotiations with C.I.T. Financial Corporation on a deal which they ultimately accepted.
 
 
 63
 The Pickers had advised Eberstadt early in 1958 that they had been approached by C.I.T. and had told C.I.T.'s representatives to talk with Eberstadt. This C.I.T. refused to do, preferring to deal directly with the Pickers. As a consequence, Eberstadt & Co. had no direct part in the negotiations that led to the deal finally perfected with C.I.T., although, during the course of their negotiations with C.I.T., the Pickers lent C.I.T. a copy of the updated Eberstadt & Co. report.
 
 
 64
 In May of 1958, Harvey Picker submitted to C.I.T. a set of proposals for handling minority interests in the various Picker corporations in a manner designed to maintain management incentive in the merged enterprise. In the main, these suggestions were embodied in the completed transaction with C.I.T., which was consummated on August 12, 1958, through an exchange of 341,063 shares of C.I.T. common stock for all of the stock of Picker X-Ray and Picker-Waite, and part of the common stock of nine of the ten affiliated Picker companies.
 
 
 65
 The value the Pickers received in the C.I.T. transaction was about the same as the price Eberstadt & Co. had negotiated with Bell & Howell, and there were similarities between the C.I.T. transaction and some of the deals with other companies which Eberstadt had proposed or recommended, but none of the earlier proposals was identical with the transaction finally consummated.
 
 
 66
 The Pickers had doubtless learned a lot through their dealings with Eberstadt, and with the candidates for merger unearthed by Eberstadt & Co., but they had undertaken no obligation to pay Eberstadt & Co. for instruction, and Eberstadt & Co. had no direct responsibility for the C.I.T. transaction.
 
 
 67
 Following the Pickers' rejection of the Bell & Howell proposal, and Harvey Picker's spontaneous offer to "provide some compensation" to Eberstadt & Co., the Pickers and Eberstadt had several conferences concerning the amount to be paid Eberstadt. On June 17, 1958, during one of the conferences, Eberstadt said his company would be prepared to discuss a settlement if it could be reached promptly and without lengthy discussion.
 
 
 68
 The precise implications intended by Eberstadt's statement are not wholly clear.[6] He testified that he regarded the Pickers, rather than the corporation, as his clients, and that, although he did not believe Eberstadt & Co. was entitled to the full amount it would have received if one of the transactions it had initiated had been consummated, he did believe Eberstadt & Co. was entitled to substantial compensation for bringing them the Textron and Bell & Howell transactions, which met their stated objectives, but which they rejected. Regardless of whether litigation would have established that Eberstadt & Co. had a legal right to compensation, it is evident that Eberstadt was claiming such a right in his discussions with the Pickers, and Harvey Picker was under the impression that his statement at the meeting on June 17, 1958, implied a threat of a law suit if some settlement were not reached promptly. That impression was one of the factors that ultimately induced the Pickers to pay Eberstadt & Co. the $100,000 finally agreed upon.
 
 
 69
 On October 7, 1958, the Pickers' attorney sent Eberstadt & Co. two checks of $50,000 each, and, on October 9, a receipted bill was sent to each of the Pickers for $50,000 "for financial and investment advice for the period from April 1957 to date."
 
 
 70
 On their federal income tax returns for 1958, the Pickers each claimed a deduction of $50,000 for financial and investment advice. The deductions were disallowed and deficiencies were assessed and paid by the Pickers, each of whom filed a timely claim for refund, which was disallowed. These suits followed in due course.
 
 
 71
 By its terms, section 212 of the Internal Revenue Code, under which the Pickers claim the right to deduct the payments they made to Eberstadt & Co., applies only to individuals, not to corporations.[7]
 
 
 72
 According to the regulations issued to implement the statute, an individual's expenses, in order to be deductible under section 212, must be "ordinary and necessary," and, in order to be ordinary and necessary, they must be "reasonable in amount and must bear a reasonable and proximate relation to the production or collection of taxable income, or the maintenance of property held for the production of income."[8]
 
 
 73
 The regulations specifically include, among the kinds of expenses that are deductible, fees for services of investment counsel paid or incurred for the production of income or for the management, conservation, or maintenance of investments held for the production of income, if such fees are "ordinary and necessary under all the circumstances, having regard to the type of investment and to the relation of the taxpayer to such investment."[9]
 
 
 74
 The plaintiffs agree that payments made by a corporation or by corporate shareholders on behalf of a corporation are not deductible by the shareholders.[10]
 
 
 75
 To a considerable extent, the defendant's arguments as to why the court should hold that the payments made to Eberstadt & Co. by the Pickers in 1958 were not deductible expenses within the meaning of the statute and the regulations depend upon its contention that the payments were made on behalf of the Picker corporations, or for corporate purposes. The evidence does not support these arguments or bring these cases within the ambit of the cited cases which rest upon a determination whether all or a part of the expense sought to be deducted was a corporate expense, or upon a failure to show clearly that the amount claimed did not include some corporate expense.[11]
 
 
 76
 In this case, from the beginning to the end of their dealings with Eberstadt & Co., the Pickers' consistent, dominant objective was a reorientation of their personal investments in a way that would give them a more broadly diversified investment base, provide greater liquidity, and produce more investment income than they could realize from the securities of the Picker group.
 
 
 77
 With one possible exception,[12] the transactions which Eberstadt proposed, and the Pickers considered, were all designed to achieve that personal investment objective in one way or another. Meanwhile, the Pickers were quite content with the corporate form and the financial strength of the Picker group. They had no desire to change its financial structure, except as some change might be an incidental consequence of action necessary to the achievement of their personal investment objective. Their interest in the corporate consequences of the various transactions suggested was limited to assuring themselves that the public and commercial reputation of Picker products and public regard for the Picker name would not suffer detriment as a result of the means adopted for improving their investment position, and that any exchange they might make would not lessen the investment quality of their holdings or diminish, any more than necessary, their personal participation in the management of the enterprise in which their funds were invested.
 
 
 78
 These concerns, although coordinate rather than subordinate to their primary, personal objective, were wholly incidental to it. They are fully consistent with a sensible regard for the risks of exchanging investments in the business they had developed and controlled for other securities, the future value of which would depend upon factors that would be largely beyond their power to control after the exchange had occurred. Such concerns would not have arisen independently of the Pickers' desire to change the character of their personal investments.
 
 
 79
 The fact that the payments here were made for personal, rather than corporate purposes, is confirmed by the evidence that, throughout their negotiations with Eberstadt, the Pickers proceeded without formal corporate authority, without consulting anyone else in the management of the Picker enterprise on matters of policy concerning the proposals they considered, and without participation by officials of the Picker group, other than themselves, in the development, analysis, or appraisal of the transactions suggested, except for work by an auditor and the corporate treasurer that was necessary to provide them with essential facts and figures.
 
 
 80
 None of the Pickers' actions suggests any deviation, during the 7 years they were dealing with Eberstadt, from their initial purpose to alter the character of their personal investment portfolio so as to avoid the disadvantages of excessive concentration in unlisted securities of a closely held enterprise, operating in a limited field. They were obviously in no great hurry about this, and there is no persuasive evidence that they had any interest in alterations of the corporate or financial structure of the Picker enterprise, except as such alterations might be incidental consequences of the means proposed for accomplishing their personal investment objective.
 
 
 81
 For these basic reasons, those cases the defendant relies upon which hold, with respect to varying factual circumstances, that corporate shareholders may not deduct payments made for corporate purposes are tangential to the issue established by the evidence in this case. Here, the persistent and unvarying purpose of the Pickers' utilization of Eberstadt & Co.'s services was plainly a personal purpose to rearrange their individual investments so as to improve, among other things, their capacity to produce income, and the two $50,000 payments the Pickers made to Eberstadt & Co., in 1958, were made to cover expenses the Pickers incurred personally in the course of a deliberate effort to manage the personal property they held invested in securities for the production of income in a way that would result in its producing more income.
 
 
 82
 Similarly inapplicable, and for basically similar reasons, are those cases which deny deductions because of a failure of a corporate shareholder, claiming a deduction, to separately identify amounts paid for individual purposes and distinguish them from other amounts paid for corporate purposes.[13]
 
 
 83
 There is no need or reason here, nor any basis, for sorting out and allocating the payments made to Eberstadt between corporate and individual expense. The Pickers' corporate objectives, if indeed they could fairly be said to have had any, were entirely incidental to their primary personal objective. The evidence affords no ground for belief that they ever would have initiated discussions with Eberstadt, or would have continued them over 7 years, for any corporate purpose.
 
 
 84
 Inevitably, however, each of the conventional means for achieving their individual purposes projected corporate consequences, and the Pickers had a reasonable degree of concern with what those consequences would be. They wanted to be satisfied, with respect to each of the transactions proposed, that it would not frustrate the most advantageous practicable fulfillment of their personal objective. But their concern with these consequential factors would not reasonably require or permit an allocation to a corporate purpose of all or a portion of the cost of exploring the relative advantages, disadvantages, and risks of various suggested ways of achieving their personal objective, even if that was what they paid Eberstadt & Co. for. It would be even less reasonable to treat as a corporate expense the cost of developing only the two proposals that met their stated requirements for altering the composition of their investment portfolios. That is all Eberstadt said he was claiming and that is what they thought they were paying for.
 
 
 85
 According to the defendant, however, even if Eberstadt's services were rendered to the Pickers as individuals, rather than as officers and directors of the Picker corporations, the costs of those services were not "ordinary and necessary" expenses of the Pickers.
 
 
 86
 Taking account of the Pickers' investment position, which led them to seek Eberstadt's services, and, ultimately, to exchange their Picker stock for the stock of C.I.T., it cannot be found that what they sought to do was not an ordinary and necessary expedient for conserving and enhancing their individual estates.
 
 
 87
 According to Eberstadt, their situation was not unusual, and the methods he proposed for remedying it were conventional ways of improving the investment position and investment income of persons so situated. There is no evidence to the contrary. His efforts were directed toward the development of a transaction designed to diversify the base of their investments in a way that would afford them greater liquidity and improve their investment income. From an investment viewpoint, these are ordinary, and, if maximum feasible income is to be realized, necessary objectives of the management of property invested in industrial securities for the purpose of producing income.
 
 
 88
 In none of the cases cited by the defendant are there facts sufficiently similar to the facts of these cases to establish any controlling principle that overrides that conclusion, or to require detailed discussion in order to distinguish the cases.[14]
 
 
 89
 The question, also raised by the defendant, whether the payments made to Eberstadt & Co., even though made by the plaintiffs to effectuate ordinary and necessary personal objectives, were non-deductible capital expenditures rather than deductible personal expenses likewise turns mainly on the facts.
 
 
 90
 There is no serious dispute with the broad proposition that reorganization expenses of a corporation are not deductible by the corporation.[15] Nor is it necessary to consider here whether there may be circumstances in which, if a shareholder pays expenses of a completed reorganization, he may deduct any of the amounts so paid. The amounts the Pickers paid to Eberstadt were not paid for any services rendered in connection with the transaction that was completed with C.I.T.
 
 
 91
 None of the transactions Eberstadt & Co. developed into a specific proposal was ever consummated, nor was any transaction or proposal on which Eberstadt & Co. did any work. Two of the Eberstadt proposals, the one with Textron and the one with Bell & Howell, reached a point where it was apparent that they conformed generally with the Pickers' stated investment objectives. But the Pickers rejected both. All of the Eberstadt proposals, including those two, were mutually exclusive, both in relation to each other and to the transaction finally consummated with C.I.T.[16]
 
 
 92
 In Massillon Bridge & Structural Co. v. Commissioner, decided September 28, 1935 (P-H B.T.A.Memo, par. 35, 335), the product of accounting work done in preparation for a transaction that fell through was used later in another transaction that was completed, and deduction of the cost of the accounting work was not allowed. But the evidence here affords no basis for identifying any portion of the amounts paid to Eberstadt & Co., in 1958, as expense incurred in developing or perfecting the transaction that was completed with C.I.T. The Pickers handled the C.I.T. negotiations without any direct help from Eberstadt & Co. They did use the report Eberstadt & Co. had prepared, but one of the Picker corporations had paid in full, in 1954, what Eberstadt & Co. had asked for that. There is nothing to indicate that the $100,000 the Pickers paid to Eberstadt & Co. in 1958 included any added charge for the report, or any charge for such informal education in corporate financial matters as the Pickers may have accumulated through their contacts with Eberstadt and their dealings with the various companies whose interest in negotiating with them had been aroused by Eberstadt & Co.'s efforts.
 
 
 93
 The only compensation Eberstadt claimed his company was entitled to receive, after the Pickers had rejected the Bell & Howell transaction, was compensation for producing the proposals by Textron and Bell & Howell, which conformed with their stated investment objectives but which they rejected. Whether any obligation the Pickers might have had to pay Eberstadt & Co. was wholly contingent upon completion of a transaction initiated through its efforts, and whether, in contested litigation, Eberstadt & Co. could have established a legal right to compensation for producing the rejected Textron and Bell & Howell proposals, remains, of course, undetermined. It is clear, however, that Eberstadt was seeking, aggressively, to procure such compensation, and that Harvey Picker thought he intended to bring a suit to establish a right to it if some settlement were not agreed upon promptly.
 
 
 94
 In Braznell v. Commissioner, 16 T.C. 503 (1951), acquiescence, 1951-2 Cum. Bull. 1, the Tax Court allowed a deduction where the amount deducted was paid in satisfaction of a judgment for breach of an obligation to pay a commission to a real estate broker for obtaining a prospective buyer whose offer was rejected. In Swaim v. Commissioner, 20 T.C. 1022 (1953), acquiescence, 1954-1 Cum.Bull. 6, the Tax Court allowed deduction of an amount paid a broker for producing an unaccepted offer for real estate, even though the court found the taxpayer had no contractual obligation for the fee and made the payment only to get the broker off his back. In this case there has been no specific determination whether there was, or was not, a legal obligation to pay Eberstadt a fee. Plainly, however, the payment was not a mere gratuity. It was made in satisfaction of a claim, apparently asserted seriously, for compensation for services rendered by Eberstadt & Co. in an effort, which proved to be futile, to develop means acceptable to the Pickers for improving the capacity of their investments to produce income. The fact that the property concerned was in the form of securities rather than real estate is immaterial. The payments were clearly expenses incurred in the course of the Pickers' efforts to so manage their property as to improve its production of income.
 
 
 95
 Because Eberstadt & Co.'s efforts were not successful in accomplishing a kind of change in the Pickers' investments which they were willing to accept, and resulted in no exchange of securities, or any other change in the form of their investments, the amount they paid Eberstadt & Co. cannot be treated as a capital expense affecting the basis of either their Picker stock or any new securities received as a consequence of the fruitless efforts for which the payments were made.[17] In any realistic sense, the payments appear clearly to be fees for investment counsel, incurred as expenses of the management of property held in the form of securities for the production of income.
 
 
 96
 In summary, taking into account the type of the Pickers' investment and their relation to it, the fact that, at the time the payments were made, Eberstadt & Co. was vigorously asserting a claim for a fee for its services as investment counsel, and the fact that the services paid for were all rendered in connection with abandoned transactions, unrelated to the merger ultimately completed, the payments are properly to be regarded, within a reasonable interpretation of the statute and the regulations, as ordinary and necessary expenses paid during 1958 for the management of property held for the production of income. Accordingly they are appropriate subjects for deduction under the statute.
 
 
 
 Notes:
 
 
 *
 The opinion, findings of fact, and recommended conclusion of law are submitted under the orders of reference and Rule 57 (a)
 
 
 [1]
 James and Harvey Picker are sometimes referred to hereafter as the Pickers
 
 
 [2]
 26 U.S.C. (I.R.C.1954) § 212 (1958 ed.) which provides:
 Expenses for production of income.
 In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year —
 (1) for the production or collection of income;
 (2) for the management, conservation, or maintenance of property held for the production of income; or
 (3) in connection with the determination, collection, or refund of any tax.
 
 
 [3]
 Eberstadt's letter of July 12, 1954, mentioned the Pickers' personal contribution to the successful operation of the business, and James Picker's concern about what might occur if anything should happen to Harvey Picker. It emphasized the advantages of "assured continuity of successful operations" that might be achieved through a merger with some large, substantial corporation
 
 
 [4]
 Except for a Mr. Zysman, the internal auditor, who prepared not only the corporate tax returns but the Pickers' personal tax returns, Mr. Barney, the corporate treasurer, and perhaps one other corporate official, the officers and minority stockholders (who were also officers) of the Picker group were not informed of the Picker negotiations with Eberstadt & Co., or of the Pickers' consideration of proposals emanating from those negotiations
 
 
 [5]
 Included among the prospects sounded out were Minneapolis-Honeywell, RCA, General Mills, American Hospital Supply Corporation, Sylvania, General Dynamics, and American Machine & Foundry
 Eberstadt's discussions with General Dynamics evolved a proposal, apparently never transmitted to General Dynamics, for the sale of Picker assets rather than an exchange of stock.
 An evaluation of a possible merger with American Machine & Foundry, furnished to the Pickers by Eberstadt & Co., suggested that, in addition to diversifying the Pickers' investment portfolios, such a merger would produce operating advantages favorable to the Picker enterprise, and interesting jobs for the Pickers.
 
 
 [6]
 The record does not disclose what amounts were considered in the prior discussions, or the precise basis of the effort to establish an appropriate measure of compensation. Nor does the record show whether Eberstadt intended to file a suit or intended his statement as a threat of litigation
 
 
 [7]
 See n. 2, supra
 
 
 [8]
 Treas.Reg. § 1.212-1(d) (1957)
 
 
 [9]
 Treas.Reg. § 1.212-1(g) (1957)
 
 
 [10]
 Deputy v. du Pont, 308 U.S. 488, 496, 60 S.Ct. 363, 84 L.Ed. 416 (1940); Low v. Nunan, 154 F.2d 261 (2d. Cir. 1946); Rand v. Commissioner, 35 T.C. 956 (1961); Kahn v. Commissioner, 26 T.C. 273 (1956); Kaplan v. Commissioner, 21 T.C. 134 (1953)
 
 
 [11]
 Cases where a deduction was allowed as a shareholder, rather than as a corporate, expense include: Beer v. United States, 132 F.Supp. 282 (S.D.Ala.1955), and Jergens v. Commissioner, P-H T.C. Memo, par. 43,322 (June 1943)
 Cases where a deduction was denied because the expense was a corporate, rather than a shareholder, expense include: Deputy v. du Pont; Low v. Nunan; Rand v. Commissioner; Kahn v. Commissioner, and Kaplan v. Commissioner, supra, n. 10; Nichols v. Commissioner, P-H T.C. Memo, par. 63,148 (May 1963); Towers v. Commissioner, 24 T.C. 199, 233, 234 (May 1955), aff'd, 247 F.2d 233, 237 (2d Cir. 1957), cert. denied, 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274 (1958); O'Connor v. Commissioner, P-H T.C. Memo, par. 54,195 (June 1954).
 The following cases involved disallowance of a deduction because of failure to allocate between shareholder and corporate expense: New Colonial Ice Co., Inc. v. Helvering, 292 U.S. 435, 442, 54 S.Ct. 788, 78 L.Ed. 1348 (1934); White House Sightseeing Corp. v. United States, 300 F.2d 449, 452, 156 Ct.Cl. 527, 532, 533 (1962); Nowland v. Commissioner of Internal Revenue, 244 F.2d 450, 454 (4th Cir. 1957); Brinson v. Tomlinson, 264 F.2d 30 (5th Cir. 1959), cert. denied, 361 U.S. 830, 80 S.Ct. 79, 4 L.Ed.2d 72 (1959); Harden Mortgage Loan Co. v. Commissioner of Internal Revenue, 137 F. 2d 282, 284 (10th Cir. 1943), cert. denied, 320 U.S. 791, 64 S.Ct. 206, 88 L.Ed. 476 (1943).
 
 
 [12]
 The Pickers' inquiry about the acquisition of Tracerlab led to a report by Eberstadt & Co. but nothing further developed, and there is no adequate basis in the evidence for concluding that the work done on the Tracerlab report formed any part of the basis for Eberstadt's demand for compensation or was a factor in fixing the amount paid Eberstadt & Co. by the Pickers
 
 
 [13]
 New Colonial Ice Co., Inc. v. Helvering; White House Sightseeing Corp. v. United States; Nowland v. Commissioner of Internal Revenue; Brinson v. Tomlinson; Harden Mortgage Loan Co. v. Commissioner of Internal Revenue, supra, n. 11
 
 
 [14]
 Cf. Deputy v. du Pont, supra, n. 10; Bird v. Commissioner, P-H T.C. Memo. par. 63,016 (Jan. 1963); Nichols v. Commissioner, and Towers v. Commissioner, supra, n. 11; Kaplan v. Commissioner, supra, n. 10
 
 
 [15]
 Skenandoa Rayon Corp. v. Commissioner of Internal Revenue, 2 Cir., 122 F.2d 268, 271, cert. denied, 314 U.S. 696, 62 S.Ct. 413, 86 L.Ed. 556 (1941); Motion Picture Capital Corp. v. Commissioner of Internal Revenue, 80 F.2d 872 (2d Cir. 1936); Beneficial Industrial Loan Corp. v. Handy, 16 F.Supp. 110 (Del. 1936), aff'd per curiam, 92 F.2d 74 (3d Cir. 1937); Bush Terminal Bldgs. Co. v. Commissioner, 17 T.C. 485 (1951), aff'd, 2 Cir., 204 F.2d 575, 578, cert. denied, 346 U.S. 856, 74 S.Ct. 72, 98 L.Ed. 370 (1953); Firemen's Ins. Co. v. Commissioner, 30 B.T.A. 1004 (1934)
 
 
 [16]
 Cf. Libson Shops, Inc. v. Koehler (E.D. Mo., decided Mar. 23, 1955), (48 Am. Fed. Tax R. 1988), aff'd on another issue, 229 F.2d 220 (8th Cir. 1956), aff'd, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924, rehearing denied, 354 U.S. 943, 77 S.Ct. 1390, 1 L.Ed.2d 1542 (1957); Tobacco Products Export Corp. v. Commissioner, 18 T.C. 1100 (1952), modified on other issue, 21 T.C. 625 (1954), nonacquiescence, 1955-2 Cum.Bull. 11; Sibley, Lindsay & Curr Co. v. Commissioner, 15 T.C. 106 (1950), acquiescence, 1951-1 Cum.Bull. 3; Warner Mountains Lumber Co. v. Commissioner, 9 T.C. 1171 (1947), acquiescence, 1948-2 Cum.Bull. 4
 
 
 [17]
 Cf. Snively v. Tomlinson, 303 F.2d 325 (5th Cir. 1962); Commissioner of Internal Revenue v. Murphy's Estate, 229 F.2d 569 (6th Cir. 1956); W. D. Haden Co. v. Commissioner of Internal Revenue, 165 F.2d 588 (5th Cir. 1948); Boulton v. Heiner, 3 F.Supp. 372 (W.D.Pa.1932)