*Decision will be entered under Rule 50.*

VERNON KEITH GRAVES AND THEODORA GRAVES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

HAROLD J. GRAVES AND BEULAH F. GRAVES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3644–65, 3645–65. Filed April 10, 1967.

*William H. Kinsey*, for the petitioners.
*Merritt S. Yoelin*, for the respondent.

MULRONEY, *Judge:* Respondent determined the following income tax deficiencies:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 3644–65 | Vernon Keith Graves and Theodora Graves_____ | 1960<br>1961<br>1962<br>1963 | $1,063.01<br>2,233.11<br>706.03<br>2,263.65 |
| 3645–65 | Harold J. Graves and Beulah F. Graves_____ | 1958<br>1961<br>1962<br>1963 | 9,189.17<br>418.79<br>1,274.41<br>4,434.60 |

The issue in these consolidated cases is whether respondent correctly determined the useful lives as of September 1, 1959, of certain buildings located in Chicago, Ill., and the components of such buildings. The year 1960 in docket No. 3644–65 is involved solely because of the elimination of a net operating loss carryback from 1963 due to respondent's adjustments made in petitioners' income for 1963, and the year 1958 in docket No. 3645–65 is involved solely because of the elimination of a net operating loss carryback from 1961 due to respondent's adjustments made in petitioners' income for 1961.

### FINDINGS OF FACT

Some of the facts were stipulated and they are so found.

Vernon Keith Graves and his wife, Theodora, are residents of Oregon. They filed joint income tax returns for the years 1960, 1961, 1962, and 1963 with the district director of internal revenue for the district of Oregon. Harold J. Graves and his wife, Beulah, are residents of Oregon. They filed joint income tax returns for 1958, 1961, 1962, and

1963 with the district director of internal revenue for the district of Oregon.

Sawyers, Inc., is a manufacturer of stereoscopic slides, viewers and other photographic equipment, and it is also engaged in research along these lines. Sawyers, Inc., maintains its home office and manufacturing complex in Progress, Oreg. Harold Graves was associated with Sawyers, Inc., for 34 years. He was president of the corporation and a member of its board of directors from about 1931 to 1957.

In 1951, Sawyers, Inc., purchased land at 3500 N. Kostner Avenue, Chicago, Ill., containing 23,043 square feet for $17,722.38 [1] and in 1952, constructed a single story structure for $158,579.61. A second floor was added during 1954 at a cost of $95,870.13. The first and second floors contained a total of 28,500 square feet. On November 28, 1958, Sawyers, Inc., purchased the adjoining land and building at 3512 N. Kostner Avenue from Bell & Howell Corp. for a total purchase price of $366,375, which was allocated $342,524 to the building and $23,851 to the land. The two-story building at 3512 N. Kostner Avenue was constructed in 1952 and contained a total of 41,020 square feet. Sawyers, Inc., used the Chicago property as a distribution center, a sales office, and for research and development.

Sawyers, Inc., used the following useful lives for the purpose of computing depreciation of the buildings at 3500 and 3512 N. Kostner Avenue:

| Location | Useful life | Depreciation commenced |
|---|---|---|
| 3500 N. Kostner Avenue | 40 years | Oct. 1, 1952 |
| 3500 N. Kostner Avenue (2d floor addition) | 38 years | Oct. 1, 1954 |
| 3512 N. Kostner Avenue | 34 years | Jan. 1, 1959 |

The corporation did not separate the components from the buildings for the purpose of computing depreciation.

As of August 31, 1959, the book value of the Chicago property owned by Sawyers, Inc., was as follows:

*Buildings*

| | |
|---|---|
| 3500 N. Kostner Avenue (orig. bldg.) | $131,160.48 |
| 3500 N. Kostner Avenue (2d floor addition) | 83,465.97 |
| 3512 N. Kostner Avenue | 335,807.84 |
| | 550,434.29 |

*Land*

| | | |
|---|---|---|
| 3500 N. Kostner Avenue | $17,772.38 | |
| 3512 N. Kostner Avenue | 23,851.00 | 41,623.38 |
| | | 592,057.67 |

[1] There is an unexplained discrepancy in the stipulation in the cost of the land (Stip. No. 5) and the book value of the Chicago property as of August 31, 1959 (Stip. No. 7).

On September 1, 1959, the following stockholders of Sawyers, Inc., acquired the Chicago property from the corporation in return for stock in Sawyers, Inc., having a value of $592,057.67:

| Stockholder | Undivided percentage ownership |
|---|---|
| Harold J. Graves | 36.90 |
| Beulah F. Graves | 36.90 |
| Vernon Keith Graves | 10.81 |
| Theodora J. Graves | .62 |
| Robert Graves | 10.81 |
| Juanita M. Graves | .62 |
| Rex Graves | 3.34 |
| | 100.00 |

The above stockholders are hereinafter called the owners.

After acquiring the Chicago property the owners leased the property back to Sawyers, Inc., under a written lease for a 5-year term starting on September 1, 1959, and ending August 31, 1964, at a monthly rental of $3,000. The lease contained a renewal option which Sawyers, Inc., exercised thereby extending the lease term for the 5-year period starting September 1, 1964, and ending August 31, 1969, at a monthly rental of $3,750. Under an instrument dated December 28, 1964, the owners, for a stated consideration of $15,000, granted to Sawyers, Inc., an option to lease the Chicago property for another term of 5 years starting on September 1, 1969, and ending August 31, 1974, at an annual rental of $45,000.

Under the terms of the lease the lessee was obligated to pay for insurance coverage of various types and to maintain the leased premises, including heating and air-conditioning systems, interior wiring and plumbing, and drain pipes to sewers or septic tanks in good order and repair during the entire term of the lease at the lessee's own cost.

For the purpose of computing the annual depreciation deduction on the Chicago property, the owners assigned a 25-year life to the two buildings and a 5-year life to heating, electrical, and plumbing components of each building. A total depreciation deduction of $39,387.51 was computed on their tax returns by the owners of the Chicago property for each of the years 1960, 1961, 1962, and 1963 as follows:

| Asset | Cost | Useful life | Depreciation |
|---|---|---|---|
| | | Years | |
| Bldg.—3500 N. Kostner | $ 91,651.82 | 25 | $ 3,666.00 |
| Heating, etc., components | 39,508.66 | 5 | 7,902.00 |
| 2d floor addition | 65,566.89 | 25 | 2,622.69 |
| Heating, etc., components | 17,899.08 | 5 | 3,579.00 |
| Bldg.—3512 N. Kostner | 284,648.34 | 25 | 11,385.93 |
| Heating, etc., components | 51,159.50 | 5 | 10,231.89 |
| | 550,434.29 | | 39,387.51 |

A depreciation schedule showing the above computation was attached to the income tax returns filed by petitioners (as well as the other owners of the Chicago property) for the years 1960 through 1963. In each of those years, the total depreciation of $39,387.51 was subtracted from the $36,000 received as annual rental of the Chicago property under the lease to show a net loss of $3,387.51 each year in connection with the Chicago property. This net rental loss of $3,387.51 from the Chicago property was then allocated to the various owners in each of the years 1960 through 1963 on the basis of their undivided interests in the Chicago property.

Respondent determined in his statutory notices of deficiency that the two buildings at 3500 and 3512 N. Kostner Avenue in Chicago each had a useful life of 45 years and that the components in each of the buildings had a useful life of 25 years. Accordingly, respondent disallowed a portion of the depreciation claimed by petitioners in computing their rental income from the Chicago property in each of the years 1961, 1962, and 1963.

On June 26, 1961, Harold J. and Beulah F. Graves filed an application for tentative carryback adjustment showing a 1960 net operating loss of $12,855.97 carried back to 1957, generating a claimed 1957 refund of $6,207.02. The 1957 refund was allowed on July 27, 1961, in the amount of $6,207.02, plus interest of $182.72. A revenue agent was then assigned to audit the relevant years and on June 18, 1962, he issued a report involving the years 1957, 1959, and 1960 which, after adjustments, allowed additional refunds of $1,583.66 and $500 for the years 1957 and 1959, respectively. The audit report showed two adjustments for 1959 involving (1) a mine expense deduction and (2) the amount of a capital loss. The audit report contained the words "no change" as to all items of income for 1960.

On or about October 26, 1962, Harold J. and Beulah F. Graves filed a claim for refund of their 1958 taxes in the amount of $9,251.09, resulting from the carryback of a 1961 net operating loss. A revenue agent was assigned to audit the relevant years and on May 24, 1963, he issued a report concerning the years 1958 and 1961 allowing a refund of $9,189.17, plus interest, for 1958. The audit report contained the words "no change" as to all items of income for 1961.

OPINION

Immediately before the start of the trial the petitioners amended their petitions to allege that the respondent is precluded by Rev. Proc. 62–21 from disturbing the depreciation deductions claimed by them on the Chicago property for the years 1961, 1962, and 1963. Petitioners argue that in the prior audits of the returns of Harold J. and Beulah F. Graves for the years 1959, 1960, and 1961 the class lives assigned to

the two buildings in Chicago, as well as the components of such buildings, were accepted by the revenue agents within the meaning of section 3.05 of Part II of Rev. Proc. 62–21 and that consequently, under the terms of that subsection, the class lives of such assets may not be disturbed now by respondent.

Rev. Proc. 62–21, which was put into effect in July 1962, and was not made retroactive, represents a basic reform in the standards and procedures to be followed in determining depreciation for tax purposes. Replacing the old Bulletin "F" guidelines for depreciable lives, the Revenue Procedure supplies new guideline lives for broad classes of assets which, generally, will permit a more rapid depreciation of assets. A key feature of the Revenue Procedure is that it provides an objective test, the reserve ratio test, to determine the appropriateness of the depreciation taken by a taxpayer. The reserve ratio test is an objective technique for establishing that a taxpayer's retirement and replacement practices for a guideline class of assets are consistent with the class life he is using.

The Revenue Procedure is a comprehensive plan designed to put the new depreciation policies into practice and it must be viewed as a whole. Part I of the Revenue Procedure provides guideline lives for broad classes of assets, Part II contains a detailed description of procedures to be followed in examining depreciation deductions, and Part III contains the reserve ratio table and the adjustment table for class lives. Section 2 of Part II sets forth the procedures to be followed where the class life used by the taxpayer is equal to or longer than the guideline life for a guideline class, while section 3 of Part II states the procedure to be followed where the class life used by a taxpayer is shorter than the guideline life for a guideline class.

Section 3.01 of Part II provides that where the class life is shorter than the prescribed guideline life for a guideline class the depreciation deduction claimed by the taxpayer for the assets in that class will not be disturbed if the conditions of subsection .02, .03, .04, or .05 of section 3 are met. Section 3.01 also states that "Subsection .05 sets forth the applicable rules for taxable years subsequent to a year for which the class life was *examined and accepted* by the Internal Revenue Service." Section 3.05 provides, in part, as follows:

.05 *Subsequent use of class life previously justified.*—Where the class life used by a taxpayer was examined by the Internal Revenue Service and was accepted by reason of subsection .02, .03, or .04 of this section, or where such class life was accepted on audit by the Internal Revenue Service under presently established procedures for examining depreciation (whether before or after the effective date of this Revenue Procedure), the depreciation deduction claimed by the taxpayer for the assets in that class in any subsequent taxable year based on that class life will not be disturbed if the taxpayer's retirement and replacement practices for that class are consistent with the class life being used. This

consistency may be demonstrated either by the reserve ratio test set forth in section 5 of this Part or by all the facts and circumstances.

Section 3.05 then goes on to state that the *"previously justified"* class life will not be questioned during a period of 3 years in order to give taxpayers an opportunity to conform their retirement and replacement practices with the class life being used.

It is obvious that a class life will be considered "accepted on audit" under the above rules only where such class life has been specifically examined and accepted. This is made abundantly clear in one of the interpretive questions and answers that accompanies the new Revenue Procedure, where the phrase "accepted on audit" as used in section 3.05 is explained as covering "all situations in which the audit report shows adjustments to depreciation or contains comments that the depreciation deduction was examined but not adjusted, or where other specific evidence indicates that the depreciation deduction was examined." [2]

The two audit reports, one covering the years 1957, 1959, and 1960 and one covering the years 1958 and 1961, are in evidence and neither one contains the slightest comment or any other "specific evidence" that the depreciation deductions on the Chicago property (acquired in September 1959), as shown on the returns of Harold J. and Beulah F. Graves were examined. The 1959 and 1960 returns were examined after the taxpayer had filed an application for a tentative carryback to 1957 of a 1960 net operating loss and a refund for 1957 had been allowed. The audit report simply shows two minor adjustments for 1959 and no changes as to 1960. Similarly, the 1961 return was examined after taxpayers filed a claim for refund of 1958 taxes resulting from the carryback of a 1961 net operating loss. The audit report indicated no change and a refund for 1958 was allowed.

Moreover, the buildings being depreciated were located in Chicago, while the audits were performed in Portland, Oreg. There is no evidence that the two revenue agents who performed the audits ever requested a collateral investigation of the Chicago property. Both revenue agents were present at the trial and one testified briefly for respondent but was asked no question about his audit. The burden was on petitioner to prove the Chicago property life was "accepted on audit." Respondent might well have a duty to make the agents who made the audits available for petitioner, which he admittedly did in this case, and petitioner was free to put them on the stand but respondent had no burden to prove the agents did not specifically examine and accept the depreciation deduction. The respondent's failure to have the agents testify with respect to the audits does not mean petitioners can indulge in the presumption that if respondent had called on them to testify with

---

[2] See question 49, at 1962-2 C.B. 477.

respect to the audits their testimony would have been adverse to respondent.

We do not believe, on this record, that petitioners have brought themselves within section 3.05 of Rev. Proc. 62–21 or within any of its other provisions so as to preclude the respondent from adjusting the useful life for depreciation purposes of the Chicago property for the years before us. Nor is respondent so precluded by any revenue rulings issued prior to Rev. Proc. 62–21.

Respondent contends on brief that as of September 1, 1959, the two buildings in Chicago each had a useful life of 38 years and the heating, electrical, and plumbing components of such buildings had a useful life of 28 years. Petitioners depreciated the buildings over a 25-year life and the components over a 5-year life. As indicated in our Findings of Fact, Sawyers, Inc., constructed a one-story building at 3500 N. Kostner Avenue in Chicago in 1952, added a second story in 1954, and acquired the building on the adjoining property in November 1958. Sawyers, Inc., was a manufacturer of photographic equipment and used the Chicago property as a distribution center, a sales office, and for research and development. The corporation depreciated the original building over a useful life of 40 years, the second floor addition, 38 years, and the building on the adjoining property, 34 years.

When the Chicago property was transferred to petitioners and other stockholders of the corporation in September 1959, the useful life of the property for depreciation purposes was abruptly lowered, with useful lives of 25 years assigned to the two buildings, and (for the first time) the components of the buildings were separately depreciated over a useful life of 5 years. The reason for this tailoring of the useful lives of the assets is not hard to find. The Chicago property was immediately leased back to Sawyers, Inc., for a 5-year term at an annual rental of $36,000. The annual depreciation deduction of the buildings and components was, not too surprisingly, $39,387.51.

Respondent's witness stated that, in his opinion, the useful life of the two buildings as of September 1, 1959 (when the property was transferred by the corporation to the petitioners and other stockholders), was 38 years and the useful life of the components was 28 years. The witness examined the property and based his opinion not only upon its physical condition but also upon such factors as the location of the property, accessibility to public transportation, facilities within the structures, availability of a labor force, zoning, and the future potential of the property.

Petitioners' witness testified that he agreed with much of the testimony of respondent's witness and, in fact, admitted on redirect examination that he had no quarrel with the determination as to useful lives made by respondent's witness. It would seem, at this juncture,

that a dispute no longer existed as to the useful lives of the buildings and components for depreciation purposes under section 167 of the 1954 Code. However, petitioners' witness seems to rely upon a unique definition of economic useful life to justify a 25-year life for the buildings and a somewhat shorter life for the components. He stated this definition to be as follows: "Economic useful life of a building is when it gets to a point where it will not yield a return on the value of the land equivalent to pay a return on the value of the land, that is, economic usefulness is over and that is the economic life." This definition also seems to involve such things as "market reaction," "recapture rates" and the "highest and best use of a parcel of land."

It is obvious that petitioners are under a misconception as to the meaning of useful life for depreciation purposes under the Code. In *Massey Motors, Inc.* v. *United States*, 364 U.S. 92 (1960), the Supreme Court stated that "it is the primary purpose of depreciation accounting to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use (excluding maintenance expense) of the asset to the periods to which it contributes." The Supreme Court, in the *Massey* case, also alluded to the statement in *United States* v. *Ludey*, 274 U.S. 295, 301 (1927) that " 'The theory underlying this allowance for depreciation is that by using up the plant, a gradual sale is made of it.' " Petitioners' definition is far afield from these recognized concepts of the nature of depreciation for tax purposes which gear the depreciation allowance to recovery of cost over the useful life of the asset in a taxpayer's business.

We find, and so hold, that the useful life of each of the two buildings as of September 1, 1959, was 38 years and that the useful life of the components of the buildings was 28 years.

*Decisions will be entered under Rule 50.*