*An appropriate decision will be entered.*

ROBERT C. HONODEL AND CLAIRE E. HONODEL, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3843–78, 3844–78, 3845–78, 4098–78,   Filed February 18, 1981.
          4099–78, 4100–78, 4137–78, 4183–78,
          4184–78, 4522–79.

---

[1] Cases of the following petitioners are consolidated herewith: Lawrence E. Thatcher and Helen F. Thatcher, docket No. 3844–78; Ernest M. Bargmeyer and Janice L. Bargmeyer, docket No. 3845–78; Conrad J. Knowles and Concetta Knowles, docket No. 4098–78; Glen L. Momberger and Nanieve G. Momberger, docket No. 4099–78; R. Duncan Wallace and Patricia F. Wallace, docket No. 4100–78; Marlan J. Haslam and Patricia L. Haslam, docket No. 4137–78; William L. Cimino and Joyce Cimino, docket No. 4183–78; Robert D. Briggs and Joan R. Briggs, docket No. 4184–78; and Robert C. Honodel and Claire E. Honodel, docket No. 4522–79.

*Frederick S. Prince, Jr., J. Gordon Hansen,* and *John S. Chindlund,* for the petitioners.

*Richard W. Kennedy,* for the respondent.

STERRETT, *Judge:* In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax:

| Docket No. | Petitioner | Calendar year | Deficiency | Addition to tax under sec. 6653(a) |
|---|---|---|---|---|
| 3843–78 | Robert C. Honodel | | | |
| 4522–79 | and Claire E. Honodel | 1973 | $7,314.00 | --- |
| | | 1975 | 4,090.12 | --- |
| 3844–78 | Lawrence E. Thatcher | | | |
| | and Helen F. Thatcher | 1973 | 15,669.00 | --- |
| 3845–78 | Ernest M. Bargmeyer | | | |
| | and Janice L. Bargmeyer | 1972 | 17,991.04 | --- |
| | | 1973 | 14,350.45 | --- |
| 4098–78 | Conrad J. Knowles | | | |
| | and Concetta Knowles | 1972 | 8,501.68 | --- |
| | | 1973 | 11,465.12 | --- |
| 4099–78 | Glen L. Momberger | | | |
| | and Nanieve G. Momberger | 1972 | 9,872.16 | --- |
| | | 1973 | 9,102.70 | --- |
| 4100–78 | R. Duncan Wallace | | | |
| | and Patricia F. Wallace | 1972 | 5,349.97 | --- |
| | | 1973 | 4,150.67 | --- |
| 4137–78 | Marlan J. Haslam | | | |
| | and Patricia L. Haslam | 1971 | 1,085.64 | $294.67 |
| | | 1972 | 16,963.08 | 1,108.01 |
| | | 1973 | 22,735.77 | 1,185.71 |
| 4183–78 | William L. Cimino | | | |
| | and Joyce Cimino | 1972 | 8,475.18 | --- |
| | | 1973 | 5,206.06 | --- |
| 4184–78 | Robert D. Briggs | | | |
| | and Joan R. Briggs | 1972 | 2,839.13 | --- |
| | | 1973 | 3,779.47 | --- |

These cases have been consolidated for the purposes of trial, briefing, and opinion. After concessions, two issues remain for our determination: (1) What are the useful lives for depreciation purposes of the components of certain apartment projects owned by limited partnerships in which petitioners are limited partners, and (2) whether various fees paid by petitioners to Financial Management Service or its successors in interest (hereinafter FMS) are deductible under section 212 or 165(c)(2), I.R.C. 1954.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference.

Petitioners Robert C. Honodel and Claire E. Honodel, husband and wife, resided in Missoula, Mont., at the time of the filing of the petitions herein. They filed joint individual income tax returns with the Internal Revenue Service Center at Ogden, Utah, for the calendar years 1973 and 1975.

Petitioners Lawrence E. Thatcher and Helen F. Thatcher, husband and wife, resided in Salt Lake City, Utah, at the time of the filing of the petition herein. They filed a joint individual income tax return with the Internal Revenue Service Center at Ogden, Utah, for the calendar year 1973.

Petitioners Ernest M. Bargmeyer and Janice L. Bargmeyer, husband and wife, resided in Missoula, Mont., at the time of the filing of the petition herein. They filed joint individual income tax returns with the Internal Revenue Service Center at Ogden, Utah, for the calendar years 1972 and 1973.

Petitioners Conrad J. Knowles and Concetta Knowles, husband and wife, resided in Salt Lake City, Utah, at the time of the filing of the petition herein. They filed joint individual income tax returns with the Internal Revenue Service Center at Ogden, Utah, for the calendar years 1972 and 1973.

Petitioners Glenn L. Momberger and Nanieve G. Momberger, husband and wife, resided in Salt Lake City, Utah, at the time of the filing of the petition herein. They filed joint individual income tax returns with the Internal Revenue Service Center at Ogden, Utah, for the taxable years 1972 and 1973.

Petitioners R. Duncan Wallace and Patricia F. Wallace, husband and wife, resided in Salt Lake City, Utah, at the time of the filing of the petition herein. They filed joint individual income tax returns with the Internal Revenue Service Center at Ogden, Utah, for the taxable years 1972 and 1973.

Petitioners Marlan J. Haslam and Patricia L. Haslam, husband and wife, resided in Ogden, Utah, at the time of the filing of the petition herein. They filed joint individual income tax returns with the Internal Revenue Service Center at Ogden, Utah, for the taxable years 1971, 1972, and 1973.

Petitioners William L. Cimino and Joyce Cimino, husband and wife, resided in Missoula, Mont., at the time of the filing of the

petition herein. They filed joint individual income tax returns with the Internal Revenue Service Center at Ogden, Utah, for the taxable years 1972 and 1973.

Petitioners Robert D. Briggs and Joan R. Briggs, husband and wife, resided in Albuquerque, N. Mex., at the time of the filing of the petition herein. They filed joint individual income tax returns with the Internal Revenue Service Center at Ogden, Utah, for the taxable years 1972 and 1973.

Petitioners Claire E. Honodel, Helen F. Thatcher, Janice L. Bargmeyer, Concetta Knowles, Nanieve G. Momberger, Patricia F. Wallace, Patricia L. Haslam, Joyce Cimino, and Joan R. Briggs are parties herein solely by virtue of having filed joint individual income tax returns with their respective husbands for the years at issue.

Petitioners were limited partners in four limited partnerships. The names of the limited partnerships and the petitioners' respective percentage interests are shown in the following table:

| Partnership | Limited partners | Percentage |
|---|---|---|
| Rancho Fulton | Thatcher | 10 |
| | Bargmeyer | 10 |
| | Haslam | 10 |
| Rancho Verde A | Bargmeyer | 20 |
| | Haslam | 20 |
| | Wallace | 20 |
| Rancho Verde B | Knowles | 15 |
| | Momberger | 15 |
| | Cimino | 15 |
| | Briggs | 15 |
| College Gardens Utah | Honodel | 14.69733 |
| | Thatcher | 9.79822 |

The relevant general partner in each partnership was Spence Clark.

Rancho Fulton (hereinafter Fulton) is a Utah limited partnership which utilizes the cash method of accounting for Federal income tax purposes. Its taxable year is a calendar year. Fulton was formed for the purpose of acquiring, developing, building, and operating a 204-unit apartment complex named Rancho Fulton and located in Sacramento, Calif. On its 1973 Federal partnership income tax return, Fulton claimed a depreciation deduction of $224,991 on the apartment complex. Depreciation

was computed on a component basis using useful lives for each component as determined by its general partners.

Rancho Fulton apartment complex consists of 204 units, situated on 9.5 acres of land, at 1530 Fulton Avenue, Sacramento, Calif. The construction may be described as two-story wood frame with a pitched asbestos shingled roof. The exterior walls are stucco with a wood trim. In the Rancho Fulton apartment complex, there are 52 one-bedroom/one-bath units; 76 two-bedroom/one-bath units; 50 two-bedroom/one-and-one-half-bath units; and 26 three-bedroom/one-and-one-half-bath units. There are four groups of apartment buildings, each with its own laundry facility. In the center of the property is the office, a recreation room, and one conventional-sized pool. Approximately 1.5 open parking places per apartment are provided. The complex also includes a day care center. Each apartment has central air-conditioning and heating, a dishwasher, and a disposal. These units were ready for occupancy in 1973.

Rancho Verde A is a Utah limited partnership which utilized the cash method of accounting for Federal income tax purposes. The taxable year of Rancho Verde A partnership is the calendar year. Rancho Verde B is a Utah limited partnership which also utilized the cash method of accounting for Federal income tax purposes. The taxable year of the Rancho Verde B partnership is also the calendar year. Rancho Verde A and Rancho Verde B partnerships (hereinafter collectively called Verde) each were formed for the purpose of acquiring, developing, building, and operating one-half of a 220-unit apartment complex named Rancho Verde and located in Sacramento, Calif. Each partnership claimed depreciation on half of the apartment complex on their 1972 and 1973 Federal partnership income tax returns. Depreciation was calculated on a component basis using useful lives for each component as determined by its general partners. The resulting depreciation deductions taken for the calendar years 1972 and 1973 by Rancho Verde A were $98,848 and $219,347, respectively, and those taken by Rancho Verde B were $86,655 and $226,310, respectively.

The parties have stipulated that the useful lives for depreciation purposes as determined by this Court for the components of the Rancho Fulton apartment complex also will be utilized for the Rancho Verde A and Rancho Verde B apartment complex.

College Gardens Utah is a Utah limited partnership which

utilizes the accrual method of accounting for Federal income tax purposes. The taxable year of the partnership is the calendar year. College Gardens II is a California limited partnership which utilizes the accrual method of accounting for Federal income tax purposes. The taxable year of the partnership is the calendar year. College Gardens Utah is a limited partner in College Gardens II, owning approximately a 98-percent interest in the capital and profits and losses therein.

College Gardens II was formed for the purpose of acquiring, developing, building, and operating a 200-unit apartment project in Sacramento, Calif., under the federally subsidized assistance program implemented by section 236 of Title II of the National Housing Act (12 U.S.C. sec. 1715z–1). On its 1973 Federal partnership income tax return, College Gardens II claimed a depreciation deduction of $98,884 on the apartment complex computed on a component basis using useful lives for each component as determined by its general partners.

There are 200 units included in the College Gardens II apartment complex. They are situated on approximately 9.6 acres of an irregular "L"-shaped parcel of land. The units are two-story wood framed structures with a plywood panel exterior. There are 80 one-bedroom/one-bath units and 120 two-bedroom/one-bath units in the project. The apartments are available for rental to anyone who qualifies to live in the subsidized low-income housing. To qualify, prospective tenants must have incomes within certain prescribed guidelines. There are 1.5 open parking spaces per apartment. Each unit also has an electric wall air-conditioner.

Respondent determined in his notices of deficiency, all dated in January 1978, except in docket No. 4522–79 where the notice was dated March 6, 1979, issued to the respective petitioners, that the useful lives of the component structures of rental apartment buildings owned by the subject partnerships were understated, thereby resulting in an overstatement of depreciation expense. Accordingly, the partnership losses in the years at issue were decreased by respondent as were the petitioners' proportionate shares of such losses.

During the years at issue, petitioners were clients of FMS. FMS was formed by Spence Clark in 1967 for the purpose of providing financial management, investment, and tax analysis

and advice to its clients. It presently has approximately 300 clients. It has been remarkably successful.

In the subject years, FMS provided a full range of investment advisory services with the emphasis on real estate investments. The goal was to minimize a client's income taxes while enhancing and enlarging his estate. New clients generally were obtained through referrals from existing clients. Initially, they attended financial investment planning sessions. These planning sessions were designed (1) to familiarize the client with FMS and its various services, (2) to analyze in detail the client's existing financial position, (3) to determine the client's personal and financial objectives, and (4) to recommend an investment and financial approach in light of those objectives.

Once these initial planning sessions were completed and the client agreed to commit himself to an investment program with FMS, the client's name was placed on an investment waiting list. The waiting list also stated each client's available capital and tax shelter needs. The waiting list priority was based upon the seniority or chronology of each client's investment commitment. If a client thereafter refused to invest in investments recommended by FMS, FMS would not keep that person as a client.

Each client's financial position, needs, and objectives were reviewed and updated in periodic (at least annual) planning sessions. The results of these sessions were reflected in the investment waiting list.

During the years in question, acceptable investment projects came about through a long and arduous process, sometimes lasting several years. FMS developed business relationships with professional brokers who located potential real estate and other investments throughout the country and thereafter presented such investments to FMS for its analysis. If the investment was purchased by FMS, the broker was paid a finder's fee either by FMS or the seller.

FMS analyzed between 30 and 50 projects in the years at issue in order to unearth the projects that it chose to recommend to petitioners. The investment research and analysis involved in evaluating these projects included: (1) Market, location, and competition analysis, (2) cost flow analysis, (3) depreciation analysis, (4) tax shelter analysis, (5) investment return analysis, and (6) legal analysis. Such evaluations involved devoting varying degrees of time and energy by FMS depending on the

nature and characteristics of the individual investment opportunities. On a few occasions during the subject years, rejected projects demanded inordinate amounts of time and energy, exceeding that expended on the projects which came to fruition. Other less promising projects might have been rejected following a cursory examination.

Once accepted by FMS, investment projects were recommended to petitioners according to the waiting list priority. None of the petitioners refused to invest in projects recommended to them by FMS although the option to refuse was available. Projects rejected by FMS were not presented to or discussed with clients.

A client's investment in these recommended projects was generally evidenced by a limited partnership interest. Investors were required to make capital contributions to the limited partnership exclusive of the investment fees paid to FMS.

During the years in issue, FMS engaged outside counsel to negotiate the acquisition of investments and to prepare the various legal and other documents necessary to consummate their purchase. Outside counsel also drafted and prepared partnership agreements and other documents necessary to create the limited partnerships, the investment vehicle generally selected by FMS to hold title to its investment projects. Further, outside counsel regularly rendered legal and tax advice to FMS on miscellaneous matters relating to accepted and rejected investments and other issues concerning its clients.

Besides engaging outside assistance, FMS was also extensively involved in the acquisition phase of an accepted project. Its efforts included supervision and review of outside counsel and their work product, negotiation of terms of purchase and assistance, and participation at closing.

Petitioners invested in the subject limited partnerships, created at the direction of FMS, primarily for appreciation and "tax shelter" potential. The intent of FMS and petitioners was to sell each investment project when the desired tax benefits were no longer present. At the time of purchase, FMS and petitioners expected the investment properties to sell for at least their original cost basis.

The fee schedule used by FMS in the years at issue had two components: (1) An investment fee component and (2) a monthly retainer component. The investment fee was a flat fee repre-

senting a specific percentage of the total cost of a project. A portion of this fee was charged to each of the investors in a particular project including Spence Clark and the petitioners herein. Each paid an amount that varied according to his respective ownership interest. The amount of this flat fee was arrived at by FMS based in part upon the time and effort, the degree of difficulty, and the extensiveness of the evaluation required in analyzing the purchased investment, as well as numerous other projects which were rejected prior thereto. Some of the time and effort spent by FMS and considered in the calculation of this flat fee occurred before some of the petitioners became clients of FMS.

FMS also charged petitioners nonrefundable monthly retainer fees ranging from $300 to $1,500 per month. The magnitude of these monthly fees depended upon both the individual petitioner's income level and his financial planning, tax advice, and investment needs. At least with respect to one petitioner, the monthly retainer fees were waived for a particular year because he made substantial investments in projects recommended by FMS in that year.

In the years at issue, FMS did not maintain detailed records summarizing the potential investments which were analyzed, the time and effort expended on such investments, and the time and effort expended directly on each individual.

The fees charged by FMS were paid in cash by each of the petitioners and were deducted on their 1971, 1972, and 1973 returns as follows:

| Name | Description | Amount | Year | Total |
|------|-------------|--------|------|-------|
| Honodel | Investment fee—<br>College Gardens, Utah | $12,706.00 | 1973 | $12,706.00 |
| Thatcher | Investment fee—Fulton | 10,000.00 | | |
| | Investment fee—<br>College Gardens, Utah | 8,472.00 | 1973 | 18,472.00 |
| Bargmeyer | Monthly retainer | 2,800.00 | | |
| | Investment fee—Verde | 14,540.00 | 1972 | 17,340.00 |
| | Monthly retainer | 1,000.00 | | |
| | Investment fee—Fulton | 10,000.00 | 1973 | 11,000.00 |
| Knowles | Monthly retainers | 3,500.00 | | |
| | Investment fee—Verde | 10,905.00 | | |

| | | | | |
|---|---|---|---|---|
| | Investment fee—Glendale Shopping Center | $ 7,500.00 | 1972 | $ 21,905.00 |
| Momberger | Monthly retainers | 2,000.00 | | |
| | Investment fee—Verde | 10,905.00 | | |
| | Investment fee—Glendale Shopping Center | 7,500.00 | 1972 | 20,405.00 |
| Wallace | Investment fee—Verde | 14,500.00 | 1972 | 14,500.00 |
| Haslam | Monthly retainers | 3,000.00 | 1971 | 3,000.00 |
| | Monthly retainers | 5,000.00 | | |
| | Investment fee—Verde | 14,540.00 | 1972 | 19,540.00 |
| | Investment fee—Fulton | 10,000.00 | 1973 | 10,000.00 |
| Cimino | Monthly retainers | 2,582.22 | | |
| | Investment fee—cattle | 2,000.00 | | |
| | Investment fee—Verde | 10,905.00 | 1972 | 15,487.22 |
| Briggs | Investment fee—Verde | 10,905.00 | | |
| | Investment fee—Glendale Shopping Center | 7,500.00 | 1972 | 18,405.00 |

In addition, on its 1973 Federal partnership income tax return, the College Gardens Utah partnership deducted an investment fee in the amount of $86,456 paid to FMS. Only $61,456 of this amount is at issue herein because petitioners have conceded that $25,000 is a nondeductible capital expenditure. The parties have stipulated that the fee paid by the partnership shall be treated as though each partner paid his ratable share of this amount directly.

Respondent disallowed these deductions because petitioners allegedly failed to establish that the payments represent valid business expenses or were incurred for the management, conservation, or maintenance of property held for the production of income or in connection with the determination, collection or refund of any tax.

## OPINION

We are called upon to decide, for depreciation purposes, the useful lives of various components of the Rancho Fulton, Rancho Verde, and College Gardens II apartment complexes. This issue is inherently one of fact, and the burden rests with petitioners to prove that respondent's determination of the useful lives of the various components is erroneous. *Casey v. Commissioner*, 38 T.C.

357, 381 (1962). The parties have agreed that the component useful lives determined by this Court for the Rancho Fulton apartment complex will also be utilized for the Rancho Verde apartment complex.

Section 167 states, in pertinent part, as follows:

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

　(1) of property used in the trade or business, or

　(2) of property held for the production of income.

Section 1.167(a)–1(b), Income Tax Regs., states in pertinent part as follows:

(b) *Useful life.* For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. * * *

See also *Massey Motors v. United States*, 364 U.S. 92, 96 (1960).

At trial, both parties introduced into evidence detailed reports of their respective experts with respect to the depreciable useful life of each component of the subject apartment complexes. Petitioners' position, supported by their expert's testimony and reports, was presented in two parts. First, they presented a "physical useful life" study which determined the useful life of each of the components based on traditional concepts of physical obsolescence and deterioration. Petitioners then determined an "economic useful life" for each component by way of a sophisticated mathematical model, which was based on the physical useful life study. The economic useful life of each component was determined to be shorter than the physical useful life. Petitioners contend that those economic useful lives represented

that period over which "the asset may reasonably be expected to be useful to the taxpayer." Therefore, petitioners reason, the "economic useful life" determined by them is the useful life for depreciation purposes in accord with the applicable regulations. We disagree, although in so doing we mean no blanket condemnation of so-called "tax shelters." Each "tax shelter" is entitled to be considered on its own merits.

Petitioners' determination here of the economic useful life of each component is predicated on the theory that the useful life for depreciation purposes ends at that point in time when the investors' desired return on investment no longer appears to be obtainable. Petitioners theorize further that the anticipated rate of return on an investment includes tax benefits generated in the form of losses to be applied against income from other sources. If we take petitioners' position to its logical conclusion, investors in different tax brackets would use different useful lives. We reject petitioners' interpretation of economic useful life as embodied in their mathematical model as totally without merit.[2]

Our findings with respect to the useful life of each component must necessarily rely heavily on the opinions of the expert witnesses of both parties. In formulating his opinion, we note that petitioners' expert placed special emphasis on the "less than average quality of construction" of the apartment complexes under our consideration. He also considered the nature or type of tenant expected to be an occupant. The report of respondent's expert contained an evaluation of the actual useful lives experienced in the relevant geographic area based on numerous examples of comparable properties. Further, respondent's expert questioned building contractors and repairmen to find out

---

[2]Petitioners' mathematical model utilized to determine "economic useful life" is dependent on several external factors including interest rates, individual tax brackets, and tax rates. Each of the factors are subject to substantial fluctuations which are beyond the effective control of petitioners. Does this mean that economic useful life is dependent on these factors and will fluctuate as they do? The Supreme Court in *Massey Motors v. United States,* 364 U.S. 92, 97–98 (1960), could not have contemplated such an interpretation of "economic useful life." The Supreme Court focused internally on the *nature* of the taxpayer's business and the use of an asset therein. Petitioners focused on themselves as investors and on these external factors which are outside the realm of a business's nature. Rather, they should have focused on the nature of the partnerships' rental business and the use of the apartment complexes and their various components in that business. See, e.g., *Graves v. Commissioner,* 48 T.C. 7, 15 (1967), affd. 400 F.2d 528 (9th Cir. 1968), wherein we rejected an analogous theory of economic useful life.

what their general experience had been with respect to the useful lives of various components comparable to petitioners'.

We find the expert witnesses of both parties to be credible and each of their useful life studies to be of great evidentiary value. In many ways, respondent's expert appeared to be more knowledgeable on general appraisal techniques. However, we were impressed by petitioners' expert's testimony with respect to the construction of the very buildings at issue. Comparables are relevant and helpful, but we must always give considerable weight to an analysis of the very property at hand. Upon independent review and reflection of the entire record and a comprehensive analysis of evidence bearing on the useful lives of the components under examination, we hold that the useful lives of the components of the Rancho Fulton and College Gardens II apartment complexes are as follows:

| Rancho Fulton | | College Gardens II | |
| --- | --- | --- | --- |
| Component | Useful life (years) | Component | Useful life (years) |
| Basic structure | 45 | Basic structure | 40 |
| Electrical | 30 | Electrical | 25 |
| Plumbing | 30 | Plumbing | 25 |
| Roof | 10 | Windows | 20 |
| Paint—ceiling | 15 | Air-conditioning | 9 |
| Doors and cabinets | 25 | Carpets | 6 |
| Furniture and fixtures | 8 | Blinds and shades | 6 |
| Equipment | 8 | Appliances | 8 |
| Appliances | 8 | Painting | 10 |
| Heating and air-conditioning | 15 | Roof and sheet metal | 10 |
| Parking lot | 15 | Doors and interior hardware | 20 |
| Swimming pool and equipment | 15 | Site improvements | 15 |
| Floor tile | 15 | Lawn and plants | 25 |
| Drapes | 6 | Vacuums | 5 |
| Landscaping | 25 | | |
| Signs | 15 | | |
| Carpeting | 5 | | |

We next must decide whether the fees paid by petitioners to FMS are deductible under sections 212 or 165(c)(2). The primary focus of this controversy centers on the oft litigated capital versus ordinary expense dichotomy.[3] Petitioners' contention is

---

[3]We note that sec. 162(a) must be construed in pari materia with sec. 212. Case authority which has considered whether an expense is capital versus "ordinary and necessary" under one

that such fees were paid to FMS for investment and tax advice and are therefore ordinary and necessary expenses deductible under section 212. Respondent maintains that these expenditures are not deductible because they are capital in nature; that is, such expenditures were made in connection with the acquisition of a limited partnership interest.

The relevant portion of section 212 allows a current deduction for certain expenditures if three requirements are met: the expenditures are (1) "ordinary and necessary," (2) "paid or incurred during the taxable year," and (3) either "for the management, conservation, or maintenance of property held for the production of income" or "in connection with the determination, collection, or refund of any tax."

Fees paid for investment counsel and advice concerning existing and future or potential investments have been held to be deductible as "ordinary and necessary expenses paid or incurred by an individual during the taxable year for the production or collection of income." *Mallinckrodt v. Commissioner*, 2 T.C. 1128, 1148 (1943), affd. 146 F.2d 1 (8th Cir. 1945).[4] However, expenditures that are capital in nature are not deductible under section 212 because such expenditures fail to satisfy the "ordinary and necessary" requirement of that section. Sec. 1.212–1(n), Income Tax Regs.; *Woodward v. Commissioner*, 397 U.S. 572, 575 (1970), affg. 410 F.2d 313 (8th Cir. 1969), which affd. 49 T.C. 377 (1968).

The Supreme Court in *Woodward v. Commissioner, supra* at 575–576, concisely summarized the relevant law concerning capital expenditures in the following exerpt:

*It has long been recognized, as a general matter, that costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures.* The most familiar example of such treatment is the capitalization of brokerage fees for the sale or purchase of securities, as explicitly provided by a longstanding Treasury regulation, Treas. Reg. on Income Tax § 1.263(a)–2(e), and as approved by this Court in *Helvering v. Winmill*, 305 U.S. 79 (1938), and *Spreckels v. Commissioner*, 315 U.S. 626 (1942). The Court recognized that brokers' commissions are "part of the acquisition cost of the

---

of these sections has equal applicability under the other. See *United States v. Gilmore*, 372 U.S. 39, 49 (1963); *Trust of Bingham v. Commissioner*, 325 U.S. 365, 373–374 (1945).

[4]See also sec. 1.212–1(g), Income Tax Regs.; *Abrams v. Commissioner*, T.C. Memo. 1964–256; *Picker v. United States*, 178 Ct. Cl. 445, 371 F.2d 486, 499 (1967).

securities," *Helvering v. Winmill, supra* at 84, and relied on the Treasury regulation, which had been approved by statutory re-enactment, to deny deductions for such commissions even to a taxpayer for whom they were a regular and recurring expense in his business of buying and selling securities.

The regulations do not specify other sorts of acquisition costs, but rather provide generally that *"[t]he cost of acquisition * * * of * * * property having a useful life substantially beyond the taxable year" is a capital expenditure.* Treas. Reg. on Income Tax § 1.263(a)–2(a). Under this general provision, the courts have held that *legal, brokerage, accounting, and similar costs incurred in the acquisition or disposition of such property are capital expenditures. The law could hardly be otherwise, for such ancillary expenses incurred in acquiring or disposing of an asset are as much part of the cost of that asset as is the price paid for it.*

[Citations omitted; emphasis added.]

Turning now to the determination of whether the fees paid by petitioners in the instant case are "ordinary and necessary" expenses for investment advice allowable under section 212 or are nondeductible capital expenses, we "look to the nature of the services performed" by the investment adviser rather than "their designation or treatment" by the taxpayer.[5] *Cagle v. Commissioner*, 63 T.C. 86, 96 (1974), affd. 539 F.2d 409 (5th Cir. 1976), and the cases cited therein. Our inquiry focuses on whether the services were performed in the process of acquisition or for investment advice. See generally *Woodward v. Commissioner, supra* at 577.

The "nature of the services performed" by FMS for its clientele, including petitioners, may be summarized quite simply. In periodic planning sessions, FMS evaluated and analyzed each petitioner's personal, financial, and tax status, elicited objectives and proposed investment programs in light of those objectives. Further, FMS analyzed numerous investment opportunities presented to it by outside brokers in the process of selecting the projects under our consideration. In evaluating these invest-

---

[5]Petitioners urge us to apply the origin-of-the-claim test first specifically propounded by the Supreme Court in *United States v. Gilmore, supra* at 49. See *Reed v. Commissioner*, 55 T.C. 32, 39–40 (1970), and the cases cited therein. The Supreme Court in *Woodward v. Commissioner*, 397 U.S. 572, 577–578, applied the "origin" test in holding that litigation expenses incurred in connection with appraisal proceedings had their origin in the "process of acquisition" and were therefore nondeductible capital expenditures. The Court stressed that the taxpayer's motive or purpose would not be considered. Therefore, in the case at issue herein, we follow the Supreme Court's guidance in ignoring each petitioner's "motive or purpose." We adopt an inquiry consistent with that of the Supreme Court by looking at the nature of the services performed (the origin of the fee) in determining whether such services are rendered in the process of acquisition.

ments, FMS utilized the services of outside counsel for legal and tax advice. FMS, through its agents and outside contractors, negotiated the purchase of these investments and prepared the legal documentation, including the limited partnership agreement, necessary to consummate the transaction. The potential investments that met with the approval of FMS were recommended to petitioners who had the option to invest if they so desired.

The complexity, or should we say perplexity, resulting from this factual web arises because of the dual nature of FMS's function: (1) An advisory function and (2) an acquisition function. Respondent contends that the acquisition function was all encompassing in arguing as follows:

the evidence shows that Clark [FMS] identifies suitable investment projects, forms limited partnerships which he then causes to purchase the projects, and finally sells the units of limited partnership to his clients at a fixed price per unit. * * * Accordingly, viewed from the end result and the manner in which the fees are charged, it appears they represent nothing more than part of the cost of acquiring partnership interests, or represent commissions for Clark's services in putting the project together. * * *

We disagree with respondent because he fails to focus on the "nature of the services performed" by FMS, as required in *Cagle v. Commissioner, supra.* Instead, respondent incorrectly points to the end result or consequence of such services.

We find that those services provided by FMS relating to (1) periodic planning sessions and (2) the evaluation of potential investments to the extent needed to formulate an opinion regarding such investments were investment advice. In addition, those services performed by FMS in communicating its recommendations to petitioners were investment advice. Conversely, those services rendered in the "process of acquisition" including, but not limited to, negotiating the purchase and creating the investment vehicle were capital in nature. See *Kimmelman v. Commissioner,* 72 T.C. 294, 304–305 (1979); sec. 741.

FMS adopted a two-tier fee schedule: (1) A monthly retainer fee and (2) an investment fee. We now must examine the nature of each of these fees to determine if they are allocable to currently deductible investment advice or to capitalizable acquisition costs. Generally, petitioners paid a monthly retainer fee whether or not they invested in a project recommended to them by FMS. Spence Clark testified that FMS "had doctor clients

pay us for two or three years, without receiving an investment and they may have * * * paid $5,000.00, $10,000.00, $20,000.00, $30,000.00 in fees, and still not invested." Only those clients who decided to invest in a recommended project and took advantage of FMS's acquisition function paid the investment fees. Those clients who chose not to invest and hence were not required to pay the investment fee received the exact same investment services as those who chose to invest. Conversely, petitioners could only participate in an investment if they paid the investment fee. Each petitioner voluntarily could choose to invest in the projects. Each was cognizant of the fact that a decision to invest resulted in the imposition of this investment fee. This investment fee was a cost of acquiring an interest in the limited partnership projects herein.

Based upon this reasoning, we hold that the monthly retainer fees paid by petitioners are allocable to investment advice and are therefore deductible under section 212(2). Further, we find that the investment fees paid by petitioners are nondeductible capital expenditures incurred in connection with the acquisition of partnership interests and are includable in their bases.[6] See sec. 742. Our holding is consistent with that of the Court of Claims in *Picker v. United States*, 178 Ct. Cl. 445, 371 F.2d 486, 499 (1967). In *Picker*, the Court of Claims found that fees were paid for a recommendation that was not utilized in the acquisition of a capital asset. The court held that such fees were paid for investment counsel and therefore were deductible under section 212(2).

Petitioners also urge us to examine the relative time, effort, and cost incurred by FMS in performing its advice and acquisition functions and to allocate the one-shot investment fee to each function. Therefore, petitioners argue that the portion of the investment fee allocable to the advice function should be currently deductible. We disagree.

Petitioners have the burden to justify their allocation between capital and noncapital expenditures. Rule 142(a), Tax Court Rules of Practice and Procedure. Even if we implemented

---

[6]We are assuming that the cattle investment and the Glendale Shopping Center investment (see table at pp. 359–360) were in partnership form. The fees paid for these investments are therefore treated consistently with the fees paid for the apartment projects. In any case, the form of the investment will not affect our result.

petitioners' approach, which we are not inclined to do, petitioners have failed to meet their burden of proof.

Petitioners' allocation scheme is based upon the opinion of Spence Clark, who has a vested interest in the outcome of this controversy. First of all, the record is conspicuously devoid of evidence supporting Mr. Clark's testimony and, therefore, it is impossible to determine if his allocation is reasonable. Secondly, Mr. Clark's definition of capital expenditures upon which his allocation is based appears to be more restrictive than that adopted by this Court herein. See also *Cagle v. Commissioner*, *supra* at 96–97. Thirdly, the trial record does not provide us with a sufficiently sound evidentiary handle to determine a reasonable allocation of our own under the authority of the so-called *Cohan* rule. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930).

Moreover, we have great reservations concerning petitioners' approach which requests us to inquire not only into FMS's affairs but also into the affairs of FMS's outside counsel, a further step removed. We cannot sanction such an approach under the facts and circumstances herein presented. We find support for this view in long-standing authority holding that brokerage commissions are part of the acquisition costs of securities. *Helvering v. Winmill*, 305 U.S. 79, 84 (1938). Brokerage houses perform services for their customers other than that of acquiring securities (e.g., analyze securities and make investment recommendations to their customers). Yet, the full brokerage commission is a capital expense. We find no authority allowing a deduction for portions of a brokerage commission based upon an evaluation of the relative time and effort exerted by a broker. We refuse to adopt such an approach in the instant case.

The foregoing analysis obviates the need to discuss in detail the other arguments presented by petitioners. Suffice it to say that petitioners are not allowed a loss deduction under section 165(c)(2). They have not experienced a loss in that the investment fee is included in the basis of their partnership interest and is recoverable on its sale or other disposition. In addition, no portion of the investment fee is deductible under section 212(3) as an expense paid "in connection with the determination, collection, or refund of any tax." We found the investment fee to be a nondeductible capital expenditure which, therefore, fails to meet the "ordinary and necessary" requirement of that section.

To reflect concessions made by the parties and the foregoing discussion,

*Decisions will be entered under Rule 155.*