GENE E. LOUISMET AND LEATRICE LOUISMET, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Louismet v. Commissioner
Docket No. 14936-79.
United States Tax Court
T.C. Memo 1982-294; 1982 Tax Ct. Memo LEXIS 452; 43 T.C.M. (CCH) 1496; T.C.M. (RIA) 82294; May 26, 1982. *452 Petitioners purchased a jet in July 1974. They also decided to go into the commodities trading business. They became 50-percent stockholders in a trading corporation and agreed to lease their jet to the corporation. Held, petitioners were engaged in the air charter business and commodities trading business for profit in 1974. Sec. 183, I.R.C. 1954. Held further, expenses incurred by petitioners with respect to use of the jet by the corporation were not loans to the corporation but were deductible as business expenses. Sec. 162. Held further, the commodities trading business did not commence operation until Oct. 13, 1974. Thus, expenses incurred by petitioners prior to that date were pre-operating expenses and are not deductible. Held further, petitioners have adequately substantiated under sec. 274 expenses for travel and entertainment. Petitioner was a 50-percent general partner in a partnership that owned an apartment building. Held, petitioner cannot deduct under sec. 164 his portion of special tax assessments paid, see sec. 1.164-4(b)(2), Income Tax Regs., except for the portion attributable to interest. Held further, for purposes of depreciation, the proper useful lives *453 of the heating, plumbing and electrical systems in the apartment building were 20 years. Petitioners guaranteed a loan from a local bank to an aircraft service corporation. When the loan came due and the borrower failed to pay, petitioners paid on their guaranty. Held, petitioners have failed to prove that the payment on the loan gave rise to a business bad debt deduction under sec. 164(a), (d). Hansel F. Zimmermann, for the petitioners. Dale L. Newland, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated August 10, 1979 respondent determined deficiencies in petitioners' income taxes for the taxable years 1971 through 1974 as follows: Taxable year
ended Dec. 31
Deficiency
1971
$ 2,154
1972
6,787
1973
21,613
1974
103,692
After concessions, the issues for our decision are as follows: (1) whether petitioners operated a Cessna Citation jet in 1974 as part of activities not engaged in for profit under section 183, I.R.C. 1954; [1] (2) whether certain jet aircraft expenditures paid and deducted by petitioners as ordinary and necessary business expenses under section 162 actually constituted a nondeductible loan to Island IMEX, Ltd.; *454 (3) whether any of petitioners' aircraft expenses should be characterized as "pre-operating expenditures" so as to preclude their deduction under section 162; (4) if such expenses are otherwise deductible, whether petitioners adequately substantiated travel and entertainment expenses pursuant to section 274; (5) whether Park One Hundred Partnership, in which petitioner was a 50-percent partner, was entitled to treat as real estate taxes deductible under section 164 the amounts paid for special tax assessments; (6) whether Park One Hundred Partnership may aggregate expenditures for heating, plumbing and electrical systems into a "fixed equipment account" and use a useful life of 20 years for the purpose of computing the deduction thereon for depreciation under section 167; and (7) whether petitioners' bad debt loss arising from a guaranty of a loan from Marquette National Bank to First Aircraft Service, Inc. was a business bad debt under section 166(a) or a nonbusiness bad debt under section 166(d). [2] *455 Some of thefacts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Gene E. Louismet (hereinafter Mr. Louismet or petitioner) and Leatrice Louismet (hereinafter Mrs. Louismet) resided in Minneapolis, Minnesota at the time of filing their petition herein. They timely filed joint Federal income tax returns on the cash method for the taxable years 1971 through 1974 with the Internal Revenue Service Center at Ogden, Utah. Jet Airplane Expenses
On November 1, 1970 petitioners purchased a Cessna 402A airplane for $ 100,000 from Herman J. Ross of Lighthouse Point, Florida. The Cessna 402A was a twin-engine, nonpressurized, 10-seat, turbocharged commuter airplane that was capable of traveling at about 200 to 300 miles per hour. *456 Petitioners leased the Cessna 402A to Crystal Shamrock, Inc. on November 5, 1970. The terms of the lease provided that Crystal Shamrock, Inc. would pay petitioners $ 65 per hour for use of the plane, and petitioners would pay Crystal Shamrock, Inc. $ 6 per flying hour for labor on the aircraft. Petitioners owned their airplane as equal partners and filed partnership returns with the Internal Revenue Service for the taxable years 1970, 1971, 1972 and 1973 under the name "Louismet Air Taxi." Petitioners did not advertise the availability of their airplane for lease and did not place a telephone listing in the Northwestern Bell Telephone Yellow Pages for Louismet Air Taxi. Nevertheless, the predominant usage of the airplane was by Crystal Shamrock, Inc. The partnership returns indicated that petitioners devoted from 10 to 20 percent of their time to the partnership and that their personal use of the plane ranged from 7.4 percent of the plane's total use in 1973 to 26.6 percent in 1971. They depreciated the Cessna 402A using the 200-percent declining balance method of depreciation based on a 6-year useful life. For 1970 the partnership took a depreciation deduction of $ 5,333.33 and *457 reported total ordinary loss in the amount of $ 7,899.49; for 1971 it took depreciation of $ 22,183.11 and reported total ordinary loss of $ 29,893.51; and in 1972 it took depreciation of $ 18,264.30 and reported total ordinary loss of $ 3,413.45. On September 30, 1973, the partnership sold the Cessna 402A for $ 90,000. On their return petitioners took a depreciation deduction of $ 10,074.08 for 1973, recaptured excess depreciation, and reported total ordinary income of $ 36,682.26. Subsequently, petitioners spoke with a Cessna representative who told them that there was a good market for the charter of small jets. The projections from the manufacturer were sufficiently encouraging to convince petitioners to purchase such an aircraft. Accordingly, on July 24, 1974 petitioners purchased a Cessna Citation jet for $ 764,968. The jet had a pressurized cabin and was capable of cruising at 41,000 feet, a quiet altitute above any turbulent weather. Also, it could cruise at about 425 miles per hour, which was much faster than the Cessna 402A airplane. Petitioners specified that the new jet should have eight seats rather than the usual five-or six-seat capacity. Before taking delivery *458 of the jet, Mr. Louismet hired Carl R. Rivers to be his co-pilot in the jet. [3] Mr. Rivers was certified to fly a multi-engine, turboprop aircraft and was employed at the time by another company in the Twin Cities area. Before July 1974, both attended the American Airlines Flight Academy in Fort Worth, Texas where they became familiar with systems, components, flight characteristics and emergency procedures of the jet. In addition, they each took and passed an examination given by the Federal Aviation Administration (FAA) to obtain their type-rating for jet aircraft. Although petitioners did not acquire an FAA "air taxi/commercial operator (ATCO) operating certificate" for the Citation jet, they did operate their jet pursuant to the authority given under United States Federal Air Regulations 91-33, 91-34, Subpart D. Even before entering into the contract for the Citation, Mr. Louismet approached two large corporations concering the leasing of the jet. However, the contacts proved unfruitful because each bought its own Citation. After acquiring the Citation, petitioners made the jet available for lease at $ 500 per hour. *459 In determining whether this was in line with what others were charging for comparable services, petitioner looked at advertisements of other aircraft charter services. These were charging $ 450-$ 475 per hour. He also conferred with the jet manufacturer's personnel to determine an appropriate rate. Petitioner decided that a rate of $ 500 per hour was low enough to remain competitive yet high enough to afford him a reasonable chance to break even or make a profit. In August 1974 petitioners paid $ 1,842 for stationery, envelopes, invoices and business cards designed by a local design company and printed with the name "Executive Citation Travel" with a facsimile of a Citation jet embossed next to the name. Petitioners did not maintain a listing in the Northwestern Bell Telephone Yellow Pages for Executive Citation. The airplane log and their tax return for 1974 indicate that their only paid charter during 1974 was the flight of the Naughten family from Minneapolis, Minnesota to Monterey, California on August 19, 1974, returning on August 22, 1974. In late 1973 Mr. Walter Rasmusson, a banking friend, introduced petitioner to Mr. Ronald Henriquez, a resident of Aruba, Netherlands *460 Antilles, while Mr. Henriquez was visiting relatives in Minneapolis. Mr. Henriquez was involved in banking and was associated with the Bank of Aruba. On hearing that petitioners were about to acquire a jet, Mr. Henriquez raised the proposition that petitioner might wish to become involved in the business of purchasing and selling commodities. In this connection, he suggested the plane could be used to contact suppliers of coffee or sugar in Columbia and Venzuela and to facilitate arrangements for the shipment of the commodities to a warehouse on Aruba and the sale of such goods from Aruba. Petitioner contacted a business friend, Mr. Dale Werneke of Lacrosse, Wisconsin, whom he had known for about 19 years, with respect to joining him in a commodities venture. The two orally agreed that Mr. Louismet would lease his jet to the venture at a rate of $ 500 per hour and that Mr. Werneke would supply his personal financial guaranty to secure the bank credit needed for the business. All other expenses incurred in connection with the venture would be split between them. Profits fromthe venture, after payment of airplane charter expenses, similarly would be divided equally. Petitioner *461 took delivery of his jet on July 23, 1974. From that date through August 6, 1974, petitioner's flights involved initial testing of the plane. After that date, with the exception of routine maintenance flights and the charter by the Naughten family, all other flights during 1974 were made to Canada and the Caribbean for the commodities business. On August 7, 1974 petitioner and his wife, accompanied by Mr. Werneke and his wife, and Mr. Dennis Strid and Mr. John McDonald, attorneys, left Minneapolis, Minnesota for Grand Cayman Island.Once there, petitioners, the Wernekes and their attorneys went to the Royal Bank Trust Company where they established Island IMEX, Ltd. (hereinafter Island IMEX), a Grand Cayman Island corporation, for the purpose of trading in commodities.The Royal Bank Trust Company drafted the necessary corporate papers and provided a line of credit for use by the new company through the Aruba Bank, Ltd. on the Island of Aruba. Petitioners, the Wernekes and their two attorneys then flew to Aruba where they met with Mr. Ronald Henriquez of the Aruba Bank, Ltd. There, they arranged for the line of credit from the Royal Bank Trust Company to be drawn on by Island IMEX *462 throgh the Aruba Bank. The line of credit was to be used for purchasing commodities, including coffee and sugar. They then authorized Mr. Henriques to purchase coffee and sugar using the credit of Island IMEX. Mr. Henriques was to receive 10 percent of the profits of Island IMEX in return for his efforts in introducing potential suppliers to Island IMEX, acting as interpreter, coordinating financial arrangements, assuring that purchases were delivered properly, and keeping petitioner and his partner informed about activities on Aruba that related to Island IMEX during their absence.After the arrangements with Mr. Henriquez were concluded, petitioner and his partner met with two potential sugar suppliers before departing from Aruba. After petitioner's initial trip to the Caribbean, he flew his jet from Minneapolis to the Caribbean on three separate occasions and to Canada on one occasion in accordance with his charter arrangement with Island IMEX. While in the Caribbean, flights also were undertaken by petitioner and his business partner to Columbia, Venezuela, Jamaica, Costa Rica, and Curacao. The purposes of these flights were to locate sellers of sugar, to enter into an agreement *463 with an independent laboratory on Curacao that would perform quality checks on sugar, to sign papers related to Island IMEX, and to obtain sugar storage space in a government-bonded sugar warehouse. By October 11, 1974, all arrangements for the business were completed. From October 13, 1974 on, all airplane flights were undertaken for the purpose of negotiating sugar purchases and sales or for investigating other corporate ventures. The base of operation was either Grand Cayman Island or Aruba. During the stays on such islands, petitioner and his wife, when she accompanied him, discussed the purchases and sales of commodities, made long-distance telephone calls to interested persons, and met in person with brokers or businessmen wanting to make commodities deals. All of the flights made by petitioner in his jet during 1974 were for business purposes. Neither petitioner nor his wife participated in the usual tourist activities while staying on either Grand Cayman Island or the Island of Aruba. Their sole reason for being there was to conduct business. In fact, petitioner had medical problems which required him to avoid prolonged exposure to the sun, while his wife's skin sensitivity, *464 coupled with her inability to swim, forced her to stay away from the Caribbean beaches. All of petitioners' travel expenses incurred while they were away from home were either paid for with personal credit cards or with cash. All of the expenses claimed by petitioners on their 1974 return in fact were paid. Petitioners never were required nor did in fact make any deposits to the bank account which had been opened for Island IMEX. Purchases of sugar for the account of Island IMEX were made in the latter part of 1974. When the sugar arrived at the port of Aruba, the bank provided the credit to purchase the sugar and retained the warehouse receipts as collateral after the sugar was placed in storage. The corporation sold about eight to nine tons of sugar to local buyers on the Island of Aruba in the latter part of the fall of 1974. On January 30, 1975 the Tasty Baking Company issued a letter of credit to purchase sugar from Island IMEX. The essential terms of the Tasty Baking Company letter of credit required Island IMEX to ship 500 metric tons of sugar per month, beginning in February and continuing through August 1975, a total of 3,000 metric tons at a price of $ 875 per metric *465 ton. Terms of shipment were F.O.B. Philadelphia, Pennsylvania with freight prepaid. The Tasty Baking Company directed its bank, the Central Penn National Bank of Philadelphia, to make payment to the account of Island IMEX at the Aruba Bank upon presentation of the sales documents relating to each sugar shipment. Island IMEX agreed to pay the Tasty Baking Company a penalty in an amount of $ 13,000 if it failed to make shipments of sugar in a timely manner. The Tasty Baking Company letter of credit was accepted by Island IMEX in mid-February 1975. Mr. Peter Kaiser, the vice president of purchases and distribution for Tasty Cake, a division of the Tasty Baking Company in Philadelphia, met petitioner on the Island of Aruba in February 1975. Mr. Kaiser visited the warehouse where the sugar was being stored, met and talked to Mr. Ronald Henriquez at the Aruba Bank and was flown to Colombia in petitioner's jet where he then inspected the sugar refineries from which Island IMEX was making purchases of sugar. The sugar being shipped from the refineries was wrapped in 5-pound sugar bags with an overwrap holding 100 pounds of sugar. Mr. Kaiser agreed to take shipment of such Colombian sugar *466 provided it was shipped in bulk trailers, but refused to take shipment of the sugar that was wrapped in 5-pound bags. Petitioner, his attorney and his business partner also met with Mr. Peter Kaiser at his place of business in Philadelphia in the early part of March 1975. After such meeting, petitioner understood that all freight charges being prepaid by Island IMEX on its shipments of sugar to the Tasty Baking Company would be designated as having been paid under the name of International Trading Company. The purpose was to segregate the freight charges for sugar being shipped from the Island of Aruba to Tasty from freight charges for sugar to be shipped to other prospective buyers, and thereby develop an easy way to account for all sugar shipped to Tasty. Invoices for payment of freight for sugar which had been shipped by Island IMEX from the Island of Aruba to the Tasty Baking Company in Philadelphia were sent to petitioner. The invoices, dated March 19, 1975, represented shipments of a total of 12 trailers of sugar, requested payment of freight in an aggregate amount of $ 27,540 to be paid to Econocaribe Consolidators, Inc., a Miami, Florida freight forwarder, and were billed *467 to the International Trading Company at petitioner's address in Minneapolis because the sugar was shipped by the International Trading Company for Island IMEX. At or about the time the sugar was being shipped to Tasty, sugar was being purchased by Island IMEX on the docks at the port of Aruba at approximately $ 400 to $ 500 per metric ton. Petitioner paid said freight invoices with checks drawn on his personal checking account in Minneapolis. Island IMEX made a few isolated sales of sugar to a distributor in Miami, Florida called Lizi International, Inc. Lizi International, Inc. paid for the sugar with a note and a number of checks. Petitioner has had difficulty collecting on the note. Petitioner's wife held joint title to the Citation jet and often accompanied her husband on flights. When on board, she acted as stewardess. As such, she purchased and prepared food that was served, made sure luggage was stored securely, instructed passengers about the oxygen system and operation of the seats, and otherwise acted in accordance with FAA regulations in assuring the safety of passengers and the plane. While not in flight, Mrs. Louismet handled secretarial duties for her husband and *468 attended business meetings with him. Respondent determined that petitioners' activities in 1974 were not activities entered into for profit, and therefore allowed deductions attributable to such activity ($ 228,505) only to the extent of income derived therefrom ($ 8,052). Alternatively, if the activities are found to have been entered into for profit, respondent determined that the claimed deductions were not properly deductible as ordinary and necessary expenses under section 162 and were not adequately substantiated under section 274(d). In making the above determination respondent invoked section 183(a) which provides the general rule that, if an individual engages in an activity and such activity is not engaged in for profit, the related deductions will be limited as set forth in section 183(b). Section 183(b) allows only those deductions that would be allowable without regard to whether the activity is engaged in for profit, see sec. 1.183-1(b)(1), Income Tax Regs., and only to the extent of gross income from the activity for the taxable year. Section 183(c) defines an "activity not engaged in for profit" as follows: (c) Activity Not Engaged in for Profit Defined.--For purposes *469 of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. Thus, to avoid being characterized as an "activity not engaged in for profit," the activity must constitute the carrying on of a trade or business under section 162, or an activity engaged in for the production of income or the management, etc., of property held for the production of income under section 212(1), (2). Further, section 183(d) creates a rebuttable presumption that an activity is undertaken for profit where, for 2 or more of the 5 consecutive taxable years immediately preceding the taxable year in question, gross income exceeds deductions attributable to the activity.
The test for determining whether an activity is engaged in for profit is whether the taxpayer is engaged in the activity with the predominant purpose and intention of making a profit therefrom. Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979). The taxpayer's expectation of profit need not be a reasonable one, but he must have *470 an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, 78 T.C.     (1982); Allen v. Commissioner,72 T.C. 28, 33 (1979). The determination of whether the requisite intention exists is a determination of fact to be resolved on the basis of all the facts and circumstances. Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). As is usual, the burden of proof is on the petitioners, Rule 142(a), Tax Court Rules of Practice and Procedure; Golanty v. Commissioner,supra at 426, with greater weight to be placed upon objective facts than upon petitioners' mere statement of their intent. Ec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,supra; Churchman v. v. Commissioner,68 T.C. 696, 701 (1977). Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit.The parties make much of them. These factors include: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the *471 expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is to be controlling, and all facts are to be weighed together in the divining of petitioners' true intention. Dunn v. Commissioner,supra at 720. In the instant case petitioners engaged in two activities: chartering the jet and importing commodities through Island IMEX. This much is agreed upon by the parties. Section 1.183-1(d), Income Tax Regs., provides that if a taxpayer is engaged in more than one activity, each may be a separate actvity for purposes of applying the section 183 rules. Income and deductions from each activity are considered separately in determining whether the particular activity is or is not engaged in for profit. [4] *473 Accordingly, in determining whether petitioners' activities constitute "activities not entered into for profit," [5] *474 we *472 will consider the air charter activity separately from the commodities trading business. We find that petitioners did conduct their air charter business as a profit-making enterprise within the purview of section 183. While a man of some means, the investment of $ 764,968 in the jet represented a considerable sum of money to petitioners. They could ill afford a hobby of such dimension. Further, we believe that they did make some efforts to charter the aircraft immediately following its *475 purchase in July 1974. [6] *476 As to these efforts we accept the thrust of petitioners' and their daughter's testimony. In addition, they did establish the fact of a charter to the Naughten family in 1974. Finally, we believe that one of their purposes in investing in the sugar commodity business was to secure a lessee for the aircraft. Accordingly, we hold that petitioners are entitled to offset against their charter income all direct expenses, including depreciation, of operating the aircraft. Turning to the second activity, commodities trading, we find that petitioner also entered into that activity with a business motive and an intent to make a profit. He approached the commodities venture by speaking to Mr. Ronald Henriquez of the Bank of Aruba, and then flew, with his attorneys, to Grand Cayman Island and Aruba to arrange the operations of the business. Petitioner and Mr. Werneke incorporated their business under the name of Island IMEX, Ltd., established a line of credit for sugar purchases, arranged for a warehouse in which to store sugar, made contacts with prospective suppliers, and agreed that the corporation would charter petitioners' jet for $ 500 per hour. Petitioner made trips to various Caribbean Islands and South American countries to locate suppliers of sugar. He made sales to local buyers on Aruba in 1974 and arranged for sales in 1975 to at least two United States clients, Tasty Cake and Lizi International, Inc. Based on our belief that Mr. and Mrs. Louismet physically could not tolerate bright sunshine due to their medical problems, we find that Island IMEX was not formed to serve as a mask for their use of the plane *477 to take Caribbean vacations. We are convinced that petitioner started a sugar trading business with the intention that it both would be profitable in and of itself and would operate as a lessee of the jet. We believe that petitioners acted in a business-like manner, devoted extensive time and effort to the fledgling operation, and had a bona fide objective of profit. As such, we find that section 183 does not limit the deductions attributable to petitioners' sugar trading activity, which was a trade or business for purposes of section 162. [7]
Respondent argues that the use of the jet by Island IMEX in 1974 constituted a loan from petitioner and that he should not be permitted to deduct expenses made with the expectation of reimbursement. We have already concluded that petitioner was in a profit-seeking sugar trading business. He and Mr. Werneke orally agreed that Island IMEX would pay $ 500 per hour for charter of the jet. The failure of Island IMEX to pay the money *478 it owed to petitioner does not negate the fact that petitioners incurred expenses in the course of carrying on their jet charter business and that such expenses were deductible currently by them. It is redimentary that a cash method taxpayer generally may deduct expenses when paid and must include amounts owed in income only when paid. Furthermore, the rule of Flower v. Commissioner,61 T.C. 140, 152 (1973), that reimbursable expenditures made by a taxpayer are in the nature of loans and are not deductible currently is not applicable to the situation herein. Petitioner did not expect reimbursement from Island IMEX for the precise costs of operating the jet. Rather, he incurred the expenses for the purpose of earning the agreed-upon charter rate. Therefore, the airplane expenses incurred by petitioners in pursuit of their sugar trading activity are deductible as expenses of their jet charter business as we have previously held. Respondent next asserts that petitioners' expenditures incurred prior to commencing their sugar trading business were for investigation or preparation and thus should be treated as nondeductible contributions to capital. See sec. 263(a). Prior to the enactment *479 of section 195 in 1980, costs of investigating or starting up a business were not deductible as ordinary and necessary business expenses because the taxpayer had no operating trade or business to which the expenses might be attributed. See Frank v. Commissioner,20 T.C. 511, 513 (1953).Rather, amounts that were in the nature of organizational expenses were considered contributions to capital and became part of the taxpayer's basis in his stock. In the instant case, Mr. Louismet, Mr. Werneke and their attorneys flew to Grand Cayman Island on August 8, 1974, at which time they incorporated Island IMEX, Ltd. and established a line of credit at Royal Bank Trust Company. They then flew on to Aruba the next day, where they opened an amount at the Aruba Bank and leased a warehouse near the dock for the storage of sugar, and returned to the United States on August 13, 1974. The short time that petitioners were away, coupled with the fact that their activities were not merely investigatory, indicate that the decision had already been made to engage in the commodities trading business. However, even though a taxpayer may have made a firm decision to enter a business, "he still has not *480 'engaged in carrying on any trade or business' within the intendment of section 162(a) until such time as the business has begun to function as a going concern and perform those activities for which it was organized." Richmond Television Corporation v. United States,345 F.2d 901, 907 (4th Cir. 1965); Goodwin v. Commissioner,75 T.C. 424, 433 (1980); Madison Gas & Electric Co. v. Commissioner,72 T.C. 521, 566 (1979). In the instant case, petitioner has the burden of proving when his sugar trading business began operations. Rule 142(a), Tax Court Rules of Practice and Procedure. The facts show that Island IMEX made some sales during the last few months of 1974. While no documentary evidence was submitted to help us to pinpoint when the first purchases or sales occurred, credible testimony convinces us that planning for the business was completed by October 13, 1974 and that expenses incurred on or after that date were for negotiating and consummating sugar deals. Accordingly, expenses (for hotels, meals, charter fees actually paid for the jet, etc.) incurred by petitioners in their sugar trading business prior to that date are to be treated as "pre-operating" expenses. Only expenditures *481 after October 13, 1974 are deductible as ordinary and necessary business expenses under section 162(a). [8] We are not clear whether petitioner incurred the expenses for hotels, meals, entertainment, etc. in his own personal commodities business or in his business as an employee of IMEX. However, it makes no bottm-line difference since in either event he is entitled to deduct the expenses incurred after October 13, 1974 under section 162. If he was in fact reimbursed for any of the foregoing category of expenses, he would, of course, have to include such reimbursement in income, taking an offsetting deduction under section 62(2)(A) for those particular expenses. Finally, respondent asks us to find that petitioners have not adequately substantiated, under section 274(c) and (d), their travel and entertainment *482 expenses in 1974. Section 274(d) disallows deductions for travel and entertainment expenses unless the taxpayer "substantiates by adequate records or by sufficient evidence corroborating his own statement" the amount of the claimed expense, the time and place of the travel or entertainment, the business purpose of the expense and the business relationship to the taxpayer of the persons entertained. These four elements must be established for each separate expenditure. Sec. 1.274-5(c)(1), Income Tax Regs.; Dowell v. United States,522 F.2d 708, 714 (5th Cir. 1975), cert. denied 426 U.S. 920 (1976). Section 274(c) adds the additional proviso that, if a taxpayer is outside the United States on business, no deduction is allowed for expenses allocable to nonbusiness activities. [9] *483 The parties have stipulated that all of petitioners' claimed expenses were, in fact, paid. Thus, there is no issue with respect to the amount of the expenditures. Furthermore, *484 we believe that the flight log, coupled with petitioners' credible testimony on this point, adequately substantiates all usage of the airplane. See sec. 1.274-5(c)(3), Income Tax Regs. Based on our findings above, we conclude that expenses for travel and entertainment that are attributable to the sugar trading business and were incurred on or after October 13, 1974 should not be disallowed for lack of substantiation. With respect to the applicability of section 274(c), we have already stated our conviction that neither Mr. Louismet nor Mrs. Louismet enjoyed the typical Caribbean vacation and that they would not have gone to Grand Cayman Island, Jamaica, Aruba, or any of the other Caribbean or South American places to which they flew if not for busines. Accordingly, a section 274(c) allocation need not be made. Deductions Attributable to the Park One Hundred Partnership
During each of the taxable years in issue, petitioner was a 50-percent general partner in a partnership known as Park One Hundred Partnership (hereinafter the Partnership). The Partnership owned an apartment building that was built in 1964 and located in St. Louis Park, Minnesota. During 1973 and 1974, the Partnership *485 paid special tax assessments described as follows: Date
Property
Amount Paid in 1973
Created
Tax No.
Principal
Interest
Total
1959
2136
$ 250.14
$ 90.05
$ 340.19
1959
2169
157.50
56.70
214.20
1961
2433
[10] 235.34
112.96
348.30
1965
3022
972.00
699.84
1,671.84
Totals
$ 1,614.98
$ 959.55
$ 2,574.53
Amount Paid in 1974
1959
2136
$ 250.14
$ 75.04
$ 325.18
1959
2169
157.50
47.25
204.75
1961
2433
235.34
98.84
334.18
1965
3022
[10] 972.00
641.52
1,613.52
Totals
$ 1,614.98
$ 862.65
$ 2,477.63
The interest shown above was interest paid by the municipality of St. Louis Park on its bonded indebtedness. The construction of the Park One Hundred apartment building consisted of a wood frame with a brick facade. The brick facade was attached to the building by brick ties (metal tabs) that were run every 4 or 5 feet in the mortar and nailed to the studs in the wood framing. There was a space between the brick facade and the wood frame construction of approximately 1/2 inch. The brick *486 facade served to enhance the appearance of the building, to provide an insultation dead-air gap before the wood wall, and to protect the wood frame of the building from weathering. The Partnership had a 20-year mortgage to pay for construction of the Park One Hundred apartment building. In the depreciation schedule for the Park One Hundred Partnership, there was assigned a 40-year life to the building; a 20-year life to the fixed equipment; a 10-year life to the refrigerators, stoves, etc.; a 10-year life to the furniture and furnishings; a 10-year life to the advertising sign; and a 16-2/3-year life to the swimming pool. The Partnership did not segregate and identify separate component lives of the various plumbing, electrical, and other utility expenditures that were lumped together as "fixed equipment." The accountant who prepared the depreciation schedule for the fixed equipment of the Park One Hundred Partnership depreciated such equipment using the straight-line method of depreciation for the years 1964 through 1967, then switched to the double-declining method of depreciation for the years 1968, 1969 and 1970 and thereafter reverted back to the straight-line method for the *487 years 1971, 1972, 1973 and up until the date of sale of the apartment building on May 1, 1974. On his 1974 return, petitioner reported long-term capital gain of $ 667,224 that was attributable to the sale by the Partnership of the apartment complex. We first must consider whether the Park One Hundred Partnership, in which petitioner was a 50-percent partner, is entitled to deduct amounts paid for special tax assessments on its apartment building. Respondent argues that petitioners have failed to prove that they meet any of the factual prerequisites for the deduction. Petitioners, to the contrary, argue that the specific assessments are deductible pursuant to section 1.164-4(b)(2), Income Tax Regs.
Generally, payment of state or local real property taxes is a deductible expense. Section 164(a)(1). However, taxes assessed against local benefits generally are not deductible, see generally section 164(c)(1), unless they satisfy the exceptions provided in section 1.164-4(b), Income Tax Regs. The pertinent section of the regulations provides as follows: § 1.164-4. Taxes for local benefits. (b) * * * (2) Taxes levied by a special taxing district which was in existence on December 31, *488 1963, for the purpose of retiring indebtedness existing on such date, are deductible to the extent levied for such purpose, if (i) the district covers the whole of at least one county, (ii) if at least 1,000 persons are subject to the taxes levied by the district, and (iii) if the district levies its assessments annually at a uniform rate on the same assessed value of real property, including improvements, as is used for purposes of the real property tax generally. Hence, although the deduction formerly provided by section 164(b)(5)(B), amended by the Revenue Act of 1964, Pub. L. 88-272, sec. 207(a), 78 Stat. 40 (1964), was eliminated for taxable years beginning after December 31, 1963, the deduction for taxes levied by a special taxing district in order to retire indebtedness existing on December 31, 1963 is still permitted. Revenue Act of 1964, Pub. L. 88-272, secs. 207(a), 207(c)(2), 78 Stat. 41, 43 (1964). See also S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964-1 C.B. (Part 2) at 561; H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964-1 C.B. (Part 2) at 175. The issue that we therefore must face is whether the special tax assessment was levied according to the requirements *489 of section 1.164-4(b)(2). In the instant case, the special tax assessment was made by the municipality of St. Louis Park. St. Louis Park is a suburb of Minneapolis, but is not of itself a county. Therefore, the special taxing district does not cover the whole of at least one county. We need not inquire any further with respect to the number of persons subject to the tax or the method of assessment. As the first requirement in the regulation is not satisfied, the amounts of the special tax assessment paid for principal are not deductible under section 164.Petitioners have not put forth any evidence to convince us to the contrary. [11] The next issue that we must consider is whether Park One Hundred Partnership may depreciate its heating, plumbing and electrical systems using a 20-year useful life rather than the 30-year life determined by respondent. [12] Petitioner claims that the Partnership properly aggregated all utility *490 equipment expenditures into a single "fixed equipment" account and calculated depreciation on such account using a 20-year useful life. Respondent's argument, on the other hand, as best as can be discerned, is that heating, plumbing and electrical systems should be depreciated using a useful life of 30 years, or alternatively, that the systems should be treated as separate components, each with a useful life longer than that assigned by petitioners. The burden rests with petitioners to prove that respondent's determination of the useful lives of the various components was erroneous. Welch v. Helvering,290 U.S. 111 (1933); Casey v. Commissioner,38 T.C. 357, 381 (1962). At trial, *491 petitioner testifed that he was the architect and general contractor of the apartment building, and that he supervised the entire construction. We are convinced by his testimony with respect to his involvement in the construction of the building that he was intimately familiar with the materials used and the expenditures made for the heating, plumbing and electrical systems. This testimony is buttressed by the fact that IRS Bulletin F, which was used by petitioner's accountant to assist him in his useful life estimations, supports the use of a 20-year useful life. In addition, use of 20-year useful lives for the three components in question is not out of line with the useful lives found for comparable components by this and other courts in other cases. [13] *492 Accordingly, we find that the useful lives for the heating, plumbing and electrical components were each 20 years. [14]
Bad Debt Deduction for Guaranty of Note of Fist Aircraft Service, Inc.
During 1974 petitioner kept his aircraft and equipment in a hangar which was operated by Fist Aircraft Service, Inc. (hereinafter Fist Aircraft). The Internal Revenue Service threatened to padlock the hangar and seize *493 the contents therein by reason of Fist Aircraft's delinquency in the payment of its taxes. When representatives of the Internal Revenue Service came to the airport, petitioner's airplane was not in the hangar. Nevertheless, petitioner was concerned that the Internal Revenue Service might seize his equipment which had been stored in the hangar to satisfy the tax lien which had been filed against Fist Aircraft. To protect his equipment, petitioner agreed to guaranty a loan in the amount of $ 9,335.03 made by the Marquette National Bank of Minneapolis to Fist Aircraft Service, Inc. on August 2, 1974. The proceeds of the loan were applied by Fist Aircraft to the payment of its delinquent taxes. When Fist Aircraft did not pay its note due to the Marquette National Bank of Minneapolis on October 1, 1974 in an amount of $ 9,758.22 (principal plus accrued interest), the Marquette National Bank of Minneapolis made a direct debit to petitioner's bank account for such amount in satisfaction of petitioner's guaranty on the corporate note. The charge to petitioner's account was made on November 12, 1974. Petitioner was not a stockholder of Fist Aircraft nor was he a relative of Mr. Peter Fist, *494 the major shareholder of Fist Aircraft Service, Inc. Section 166(a)(1) permits taxpayers to deduct currently debts that become wholly worthless during the taxable year. With respect to noncorporate taxpayers, section 166(d) provides that the section 166(a) current deduction shall not apply to nonbusiness bad debts. Rather, the deduction of nonbusiness bad debts is to be accorded short-term capital loss treatment, subject to the capital loss provisions of section 1211 and 1212. [15] *495 If, however, the obligation qualifies as a business debt, the taxpayer may offset the loss caused by its worthlessness against ordinary income. Petitioners maintain that their guaranty of the loan made by Marquette National Bank to Fist Aircraft on August 2, 1974 constituted a business debt that became worthless in 1974. Respondent claims that petitioners have not proved that their guaranty of Fist Aircraft's debt was made in connection with their trade or business, as required by section 166(d). [16] *496 We have already found that petitioner used his jet in his trade or business of aircraft charter. Therefore, we must consider whether, paraphrasing section 166(d)(2)(A), (1) the debt was created or acquired in connection with petitioners' businesses, or (2) the debt was incurred in petitioners' businesses. [17]
The characterization of a particular debt is a question of fact to be answered from an examination of the relationship that the loss bears to the taxpayer's trade or business. The burden is on petitioner to prove that the worthless debt should be treated as a business loss. Deely v. Commissioner,73 T.C. 1081, 1092 (1980); Rule 142(a), Tax Court Rules of Practice and Procedure. The regulations indicate that the relationship between the loss caused by worthless debt and the taxpayer's trade or business must be a proximate one. Sec. 1.166-5(b), Income Tax Regs. According to United States v. Generes,405 U.S. 93, 103 (1972), *497 the proper measure for determining whether a bad debt has a proximate relationship to the taxpayer's trade or business is that of "dominant motivation." A determination of dominant motivation is a factual question on which the taxpayer bears the burden of proof. Smith v. Commissioner,55 T.C. 260 (1970), remanded for reconsideration in light of United States v. Generes,supra, 457 F.2d 797 (5th Cir. 1972), opinion on remand 60 T.C. 316, 318 (1973). In the instant case we must consider whether Mr. Louismet's dominant motivation in guarantying Fist Aircraft's loan was related to his trade or business that developed from his acquisition of the Citation jet. Petitioner testifed that he was concerned that the IRS might padlock the hangar in which he kept his plane. He also feared that they would seize his tools and equipment stored there to satisfy tax liens that had been filed against Fist Aircraft, the owner of the hangar. [18]
In Dorminey v. Commissioner,26 T.C. 940, 945 (1956), we held that the taxpayer, a produce wholesaler, was entitled to a business bad debt deduction for losses resulting from worthlessness *498 of loans made to his supplier of bananas because such advances "were incidental to and proximately related to his produce business." Similarly, in Bart v. Commissioner,21 T.C. 880 (1954), the taxpayer was permitted to deduct as a business bad debt the losses resulting from his loans to a publishing company. We found that his loans were made to help keep the publisher in business, to protect his position as advertising agent for the publisher, and to preserve the publisher's magazines as a place in which he could place advertising for his other clients. 21 T.C. at 881. Petitioner claims that the aforementioned cases are applicable to the case at hand, arguing that he guaranteed Fist Aircraft's loan in order to allow himself to stay in business and to prevent the IRS from closing the hangar facility. We cannot agree. First, Mr. Louismet testified that he was aware of the problems that Mr. Peter Fist was having with the IRS, yet he did not move his property to another hangar. Second, we can not equate loans to one's suppliers or clients with a loan to the owner of the hangar where one keeps his airplane. In the above cases, the loans were essential to maintain a supply or an outlet *499 for the business. Here, the particular hangar that petitioner was protecting was not integral to petitioner's business.Any hangar could have served petitioner's needs as storage for the plane. Third, petitioner has not shown any business need for the loan. For instance, he has not put forth evidence of the lack of alternative hangar facilities or of the existence of a favorable rent agreement that he would want to protect. In fact, respondent has alleged that Mr. Louismet and Mr. Fist were personal friends. We think that petitioner neither adequately has refuted the inference that the loan guaranty was made for personal reasons nor has put forth a sufficient business reason to permit us to characterize the payment on the guaranty as a business bad debt. Finally, petitioner has not adduced any evidence of the identity or the value of the tools and equipment that purportedly were in the hangar when the IRS agents arrived. The only indication that petitioners owned any equipment is the fact that they took a depreciation deduction on their 1974 return, Schedule C, for "transportation equipment." However, the 1974 return also indicates that the equipment to which the deduction is *500 attributable was acquired in November 1974. Since the guaranty arose in August 1974, and the payment on the guaranty occurred as a result of an October 1, 1974 default, we conclude that the loss could not have arisen out of a concern to protect the subsequently acquired equipment. Furthermore, even if petitioners owned other equipment that was not reflected on their return, they have not proved the value of such equipment. As the tools and equipment may have been worth much less than the value of the loan guaranty, there may not have been a sufficient business reason for the guaranty to find current deductibility upon worthlessness. In sum, we find that petitioner has failed to prove that his loss should be treated as a loss from a worthless business debt. In light of the foregoing, Decision will be entered under Rule 155.
Footnotes
1. The decision on this issue will determine petitioners' entitlement to the investment tax credit under sec. 38. ↩
2. On their 1974 income tax returns, petitioners took a casualty loss deduction of $ 100 for a loss resulting from the spoilage of frozen foods due to a power failure. Respondent, in his notice of deficiency, disallowed the deduction. On brief, petitioners recognized that deductions under sec. 165(c)(3) are limited to losses in excess of $ 100. Accordingly, we consider the deduction as having been conceded, and we need not address this issue.
3. Mr. Louismet obtained his commercial pilot license in 1945.↩
4. Sec. 1.183-1(d), Income Tax Regs., provides in pertinent part as follows: (d) Activity defined--(1) Ascertainment of activity. In order to determine whether, and to what extent, section 183 and the regulations thereunder apply, the activity or activities of the taxpayer must be ascertained.For instance, where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity. In ascertaining the activity or activities of the taxpayer, all the facts and circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities.The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. If the taxpayer engages in two or more separate activities, deductions and income from each separate activity are not aggregated either in determining whether a particular activity is engaged in for profit or in applying section 183↩. * * * 5. Petitioners urge us to apply the presumption in sec. 183(d) and to find that, for 2 of the 5 years before 1974, petitioners' air charter business had turned a profit. To so find would require us to treat the Louismet Air Taxi Partnership and Executive Citation Travel as the same business. Based upon the facts, we cannot find that an activity of chartering a turborprop airplane is substantially similar to an activity of chartering a jet plane. The two aircraft differed in all material respects, including size and cost of the planes, method of operation, charter price, potential clientele and marketing approach. Sec. 1.183-1(d)(1), Income Tax Regs. ("activity" defined). In addition, in order to find the two profitable years required to apply the sec. 183(d) presumption, we would have to agree with petitioners' contention that an activity is profitable if it has a "tax savings profit" after considering applicable deductions, regardless of whether there was a positive cash flow.This we are not prepared to do. See generally Carkhuff v. Commissioner,T.C. Memo. 1969-66, affd. 425 F.2d 1400↩ (6th Cir. 1970), wherein this Court fund no profit motive in the rental of a vacation home where maximum possible rental income could cover direct operating expenses but could not have returned a profit after depreciation and taxes were deducted. Accordingly, we must determine only whether, after acquisition of the Citation jet in July 1974, petitioners were engaged in an activity not for the purpose of making a profit.
6. We are constrained to note, though, doubt with respect to the credibility of some of the documentary evidence. With respect to those letters introduced by petitioners that were dated in 1974, we are not convinced that they actually were written and sent in 1974. For instance, one letter purportedly was sent to IDS Tower on August 29, 1974. But a notation in the "IDS Tower" file indicates that the initial letter was sent on August 29, 1975. Similarly, a letter was purportedly sent to the Tenant Company on August 29, 1974. But "The Tenant Company file contains a copy of the identical letter (with an identical typographical error) that is dated August 29, 1975 and a notation that such introductory letter was sent on August 29, 1975.↩
7. Implicit in our discussion of the income and expenses of the sugar trading business is that we consider such income and expenses to be attributable to petitioners' personal sugar business and not that of Island IMEX.↩
8. Expenses are not deductible under sec. 212 because they were not incurred "for the production or collection of income" from property or a property right in which the taxpayer had an interest, or "for the management, conservation, or maintenance of property held for the production of income." See generally Weinstein v. United States,190 Ct. Cl. 437, 420 F.2d 700, 702↩ (1970).
9. SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES. (c) Certain Foreign Travel.-- (1) In general.--In the case of any individual who travels outside the United States away from home in pursuit of a trade or business or in pursuit of an activity described in section 212, no deduction shall be allowed under section 162 or section 212 for that portion of the expenses of such travel otherwise allowable under such section which, under regulations prescribed by the Secretary or his delegate is not allocable to such trade or business or to such activity. (d) Substantiation Required.--No deduction shall be allowed-- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations.↩
10. Petitioners concede that Park One Hundred Partnership could not deduct, under sec. 164, the special tax assessments for project number 3022, commenced in 1965. Sec. 1.164-4(b)(2), Income Tax Regs., infra,↩ applies only to taxing districts in existence prior to Dec. 31, 1963.
11. Of course, the portion of the tax assessment that represents interest paid is deductible. Missouri State Life Insurance Co. v. Commissioner,29 B.T.A. 401, 414 (1933), revd. on other grounds 78 F.2d 778 (8th Cir. 1934); sec. 1.164-4(b)(1), Income Tax Regs.↩
12. From a consideration of the notice of deficiency, the opening statements of the attorneys at trial and the arguments on brief, the issue appears to be the proper useful lives for the heating, electrical and plumbing systems. However, the testimony put forth at trial related predominantly to the purpose for the brick veneer of the building, and therefore to the useful life of the building shell, which is not here at issue. We focus solely on the systems that were aggregated in the fixed equipment account.↩
13. We note that in Hastings v. United States,279 F.Supp. 13 (N.D. Cal. 1967), the district court determined that proper useful lives for the heating, electrical and plumbing components of a new building were 12, 17 and 22 years, respectively. In addition, in Merchants Nat. Bank of Topeka v. Commissioner,554 F.2d 412 (10th Cir. 1977), affg. a Memorandum Opinion of this Court, useful lives of 20 years for heating, 20-25 years for electrical, and 20-30 years for plumbing were allowed. Finally, in the recent case of Honodel v. Commissioner,76 T.C. 351, 363 (1981), we considered expert testimony on the issue and found the useful lives of apartment building components to be: ↩
Component
Useful life determined
Electrical
25-30 yrs.
Plumbing
25-30 yrs.
Heating & Air conditioning
9-15 yrs.
14. Having found that the proper useful lives for each of the components was 20 years, we need not address what we have determined to be respondent's contention: that heating, electrical and plumbing are each separate components with separate useful lives. Suffice it to say that petitioner has complied with the requirements of sec. 1.167(a)-7(a), Income Tax Regs.↩, that "assets similar in kind with approximately the same useful lives may be grouped together."
15. Sec. 166 in effect in 1974 provides in pertinent part: SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within he taxable year. (d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
16. Respondent has not contested the worthlessness of the debt or the choice of 1974 as the proper year for the deduction. Petitioner testified at trial that he was never repaid for satisfying his guaranty because Mr. Peter Fist filed for bankruptcy. However, no evidence was adduced to show when such bankruptcy occurred or that the note actually was worthless. Nevertheless, we consider respondent's failure to raise these issues as concessions that the payment on the guaranty constituted a worthless debt in 1974 within the meaning of sec. 1.166-8(a)(1), Income Tax Regs.↩
17. Since the loss was sustained by a noncorporate taxpayer in discharge of his obligation as guarantor of a corporate obligation, the terms of sec. 1.166-8(b), Income Tax Regs.↩, apply.
18. We do not inquire whether petitioner's fears were justified or legally correct.↩